William **MALLORY**, et al., Plaintiffs,

v.

The **STATE OF OHIO**,
et al., Defendants.

No. C–2–95–381.

United States District Court,
S.D. Ohio,
Eastern Division.

Oct. 30, 1997.

Peter Jerome Randolph, Cincinnati, OH, Thomas I. Aitkins, Brooklyn, NY, James L. Hardiman, Cleveland, OH, Margrett Ford, New York City, for plaintiffs.

Orla Ellis Collier, III, James F. De-Leone, Norton Victor Goodman, Benesch, Friedlander, Coplan & Aronoff, Columbus, OH, James F. Friedman, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE C. SMITH, District Judge.

Plaintiff class asserts claims under § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 *et seq.* Plaintiffs allege, *inter alia*, that Defendants' use of district-wide at-large elections to elect state judges results in the denial or abridgment of minorities' right to vote.

The Court conducted a bench trial in this case on February 10–13, 18–20, and 24–26, 1997. For the reasons that follow the Court finds that Plaintiffs have failed to establish a violation of § 2 of the Voting Rights Act for any of the challenged courts, and that Defendants are entitled to judgment in their favor on all counts of Plaintiffs' Complaint.

## I. FINDINGS OF FACT

1. Plaintiffs challenge the at-large election of state appellate and trial court judges in Ohio's eight most populous counties. In their Complaint, Plaintiffs assert that the at-large election of the judges of certain of Ohio's Courts of Appeals, Courts of Common Pleas, Municipal Courts, and one County Court impermissibly dilutes the voting strength of African–Americans in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution, Article I, § 2 of the Ohio Constitution, 42 U.S.C. § 1983, and § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. Complaint at ¶¶ 1, 27–31.

2. Specifically, Plaintiffs challenge the following judicial districts: (1) *Courts of Appeals:* First District (Hamilton County); Second District (Champaign, Clarke, Darke, Greene, Miami, and Montgomery Counties); Sixth District (Erie, Fulton, Huron, Lucas, Ottawa, Sandusky, Williams, and Wood Counties); Eighth District (Cuyahoga County); and Tenth District (Franklin County); (2) *Common Pleas Courts:* Hamilton County Common Pleas; Montgomery County Common Pleas; Franklin County Common Pleas; Mahoning County Common Pleas; Stark County Common Pleas; Summit County Common Pleas; Lucas County Common Pleas; and Cuyahoga County Common Pleas; and (3) *Municipal and County Courts:* Dayton Municipal Court (Montgomery County); Montgomery County Court #1 (Montgomery County); Toledo Municipal Court (Lucas County); Bedford Municipal Court (Cuyahoga County); Franklin County Municipal Court (Franklin County); Youngstown Municipal Court (Mahoning County); and Akron Municipal Court (Summit County). Complaint at ¶ 41 (collectively, "challenged courts").

3. Defendants' Exhibits ("Def.Ex.") 6 and 7 display the courts subject to challenge, the territorial jurisdiction of each court, the number of judges for each court, the total population of each judicial district, and the black population of each judicial district. Def.Ex. C at 3. Plaintiffs have stipulated that the numbers contained in Def.Ex. 7 are accurate. Transcript ("Tr.") at 197–98. The Court hereby accepts this stipulation.

4. Def.Ex. 8 is a compilation of pertinent portions of *1990 Census of Population: General Population Characteristics, Ohio,* CP–1–37, providing total and black populations for areas comprising the judicial districts. The Court has admitted Def.Ex. 8 into evidence, Tr. at 1670, and hereby takes judicial notice of the census data contained therein, as well as all other pertinent census data. *See Grills v. Branigin,* 284 F.Supp. 176, 180 (S.D.Ind.), *aff'd,*

391 U.S. 364, 88 S.Ct. 1666, 20 L.Ed.2d 641 (1968).

5. According to the 1990 Census, the total population of Ohio is 10,847,115 of whom 1,154,826, or 10.65%, are black. *1990 Census of Population: General Population Characteristics, Ohio,* CP–1–37 at 21. See also Def.Ex. 17 at 1, No. 3.

6. Plaintiffs have submitted Plaintiffs' Exhibit ("Pl.Ex.") 45, which is a series of county maps indicating the boundaries of the challenged courts within Ohio's eight most populous counties and purporting to show the concentration of minority population within each county. Tr. at 799–801, 1524–25. These maps, in and of themselves, however, contain insufficient information to enable the Court to determine whether Plaintiffs have established the first *Gingles* precondition, *i.e.*, whether African–Americans can constitute a majority in a geographically compact hypothetical single-member district. Tr. at 978–79, 1435–36, 1524–25, 1531, 1625–26. Although these maps indicate the approximate African–American population in each census tract depicted, they do not indicate the number of Caucasians within those tracts or contain the boundaries for political subdivisions within each county. Tr. at 978–79, 1524–25, 1625–26.

7. The named Plaintiffs are twelve (12) African–Americans who reside throughout the State of Ohio (collectively, "Plaintiffs"), Def.Ex. 17 at 1, No. 1, five of whom are current or former Democratic state legislators, *i.e.*, William Mallory, Jeffrey D. Johnson, Casey C. Jones, C.J. Prentiss and Vernon Sykes. Complaint at ¶¶ 6, 12–14, 16.

8. On March 14, 1996, the Court granted Plaintiffs' request for certification of this case as a class action. The certified class is the voting age population of African–Americans entitled to vote and elect judges in each of the twenty challenged courts. Docket Entry ("D.") 45 & 46.

9. Defendants are Governor George V. Voinovich, Secretary of State Robert Taft,

and the State of Ohio (collectively, "Defendants"). Complaint at ¶¶ 18–20.

10. Before trial, the Court entered summary judgment on all of Plaintiffs' claims of intentional discrimination under the Fourteenth and Fifteenth Amendments to the United States Constitution, Article I, § 2 of the Ohio Constitution, and 42 U.S.C. § 1983. The Court also entered summary judgment in favor of Defendants on Plaintiffs' claims under § 2 of the Voting Rights Act with regard to the Sixth District Court of Appeals and the Court of Common Pleas for Stark County. D. 83. Plaintiffs have voluntarily withdrawn all of the claims upon which this Court entered summary judgment. *Plaintiffs' Opposition to Partial Summary Judgment;* Tr. at 857, 928.

11. Def.Ex. 16 is a compilation of judicial election results in the challenged courts from 1975 through 1996. Def.Ex. 15 is a distillation of those results listing only the races involving at least one African–American candidate. Plaintiffs have stipulated that, except where corrected during the trial, the information contained in these exhibits is true and correct. Tr. at 197–98. The Court hereby accepts this stipulation.

### Structure and Organization of Ohio Courts

12. The Ohio Constitution and Ohio Revised Code governs the structure, organization, and territorial jurisdiction of Ohio's state court system. See Article IV of the Ohio Constitution, R.C. Chapter 2501 (Courts of Appeals), R.C. Chapter 2301 (Courts of Common Pleas), R.C. Chapter 2101 (Courts of Common Pleas, Probate Division), R.C. Chapter 2153 (Cuyahoga County Court of Common Pleas, Juvenile Division), R.C. Chapter 1901 (Municipal Courts), and R.C. Chapter 1907 (County Courts).

13. Under Article IV, § 1 of the Ohio Constitution, "[t]he judicial power of the state is vested in a supreme court, courts of appeals, courts of common pleas and divisions thereof, and such other courts inferior to the supreme court as may from time to time be established by law." The Ohio Supreme Court, the highest court in the State, consists of seven justices: a chief justice and six justices elected statewide. Ohio Const., Art. IV, § 2(A) Def.Ex. C at 2.

14. Article IV, § 3(A), and R.C. 2501.01, divide the state into twelve compact appellate districts comprised of one or more whole counties, each of which districts has at least three judges. Def.Ex. C at 3. Defendants' Exhibit 5 is a map displaying the territorial jurisdiction of the appellate districts. The First, Eighth, and Tenth Districts are each comprised of a single county—Hamilton, Cuyahoga, and Franklin Counties, respectively. R.C. 2501.01(A), (H), & (J); Def.Ex. C at 3; Def.Ex. 7 at 1. The remaining districts are constructed by combining whole counties— no county is split between appellate districts. Def.Ex. C at 3; Tr. at 953–54. The Second District Court of Appeals is made up of Champaign, Clark, Darke, Greene, Miami, and Montgomery Counties. R.C. 2501.01(B); Def.Ex. 7 at 1.

15. Under Article IV, § 3(A), the General Assembly may increase the number of judges in any appellate district based on the volume of business within the district. Def.Ex. C at 3. Under this provision, the General Assembly has increased the number of judges in the First District to six, R.C. 2501.013(A), in the Second District to five, R.C. 2501.013(B), in the Eighth District to twelve, R.C. 2501.012(A), and in the Tenth District to eight, R.C. 2501.12(C). Def.Ex. 7 at 1.

16. Under Article IV, § 4(A) of the Ohio Constitution, "[t]here shall be a court of common pleas and such divisions thereof as may be established by law serving each county of the state." Def.Ex. C at 3. The Ohio Constitution gives the General Assembly the authority to combine one or more whole counties into a common pleas court district, Ohio Const., Art. IV, § 4(A),

but the General Assembly has declined to do so. R.C. 2301.01; Def.Ex C at 3. The Ohio Constitution does not give the General Assembly the authority to divide counties into separate common pleas courts.

17. Each county court of common pleas must have at least one resident judge. Ohio Const., Art. IV, § 4(A); Def.Ex. C at 3.

18. The courts of common pleas include a probate division and such other divisions as may be provided by law. Ohio Const., Art. IV, § 4(C); Def.Ex. C at 3.. The General Assembly has established probate, domestic relations, juvenile, and drug court divisions within specified courts of common pleas. Def.Ex. C at 3. "Judges are elected specifically to such probate division and to such other divisions." *Id.*

19. The Ohio Revised Code establishes the total number of judges for each court of common pleas and the various divisions thereof. Def.Ex. C at 3. The Court of Common Pleas for Cuyahoga County contains a General Division with 34 judges, R.C. 2301.02(C), a Domestic Relations Division with 5 judges, R.C. 2301.03(L)(1), a Juvenile Division with 6 judges, R.C. 2153.02, and a Probate Division with 2 judges, R.C. 2101.02 and 2101.021. Def. Ex. 7 at 2; Tr. at 1603.

20. The Court of Common Pleas for Franklin County contains a General Division with 16 judges, R.C. 2301.02(C), a Domestic Relations and Juvenile Division with 5 judges, R.C. 2301.03(A), and a Probate Division with 1 judge, R.C. 2101.02. Def.Ex. 7 at 2; Tr. at 1605.

21. The Court of Common Pleas for Hamilton County contains a General Division with 15 judges, R.C. 2301.02(C), a Domestic Relations Division with 3 judges, R.C. 2301.03(B)(2), a Juvenile Division with 2 judges, R.C. 2301.03(B)(1), a drug court division with 1 judge, R.C. 2301.03(B)(3), and a Probate Division with 1 judge, R.C. 2101.02. Def.Ex. 7 at 3; Tr. at 1527–28, 1604–05.

22. The Court of Common Pleas for Lucas County contains a General Division with 10 judges, R.C. 2301.02(C), a Domestic Relations Division with 2 judges, R.C. 2301.03(D)(1), a Juvenile Division with 2 judges, R.C. 2301.03(D)(2), and a Probate Division with 1 judge, R.C. 2101.02. Def. Ex. 7 at 3.

23. The Court of Common Pleas for Mahoning County contains a General Division with 5 judges, R.C. 2301.02(C), a Domestic Relations Division with 1 judge, R.C. 2301.03(E)(1), a Juvenile Division with 1 judge, R.C. 2301.03(E)(2), and a Probate Division with 1 judge, R.C. 2101.02. Def.Ex. 7 at 4.

24. The Court of Common Pleas for Montgomery County contains a General Division with 11 judges, R.C. 2301.02(C), a Domestic Relations Division with 2 judges, R.C. 2301.03(F)(1), a Juvenile Division with 2 judges, R.C. 2301.03(F)(2), and a Probate Division with 1 judge, R.C. 2101.02. Def.Ex. 7 at 4; Tr. at 1605.

25. The Court of Common Pleas for Summit County contains a General Division with 8 judges, R.C. 2301.02(C), a Domestic Relations Division with 2 judges, R.C. 2301.03(I)(1), a Juvenile Division with 1 judge, R.C. 2301.03(I)(2), and a Probate Division with 1 judge, R.C. 2101.02. Def. Ex. 7 at 5.

26. Under its authority to create inferior courts, see Ohio Const., Art. IV, § 1, the General Assembly has, by statute, created municipal courts, including the six (6) municipal courts challenged in this case, *i.e.*, the Akron, Bedford, Dayton, Franklin County, Toledo, and Youngstown Municipal Courts. R.C. 1901.01; Def.Ex. C at 3.

27. R.C. 1901.02 establishes the territorial jurisdiction of each of Ohio's municipal courts. Def.Ex. C at 3. R.C. 1901.08 establishes the number of judges for each municipal court.

28. The Akron Municipal Court has jurisdiction within the Cities of Akron and Fairlawn, the Villages of Lakemore and Mogadore (the portion in Summit County),

and Bath, Richfield, and Springield Townships in Summit County. R.C. 1901.02(A) & (B); Def.Ex. 7 at 7. The Akron Municipal Court has six judges. R.C. 1901.08; Def.Ex. 7 at 7.

29. The Bedford Municipal Court has jurisdiction within the Cities of Bedford, Bedford Heights, Solon, and Warrensville Heights, the Villages of Bentleyville, Chagrin Falls, Glenwillow, Moreland Hills, North Randall, Oakwood, Orange, and Woodmere, and Warrensville and Chagrin Falls Townships in Cuyahoga County. R.C. 1901.02(A) & (B); Def.Ex. 7 at 6. The Bedford Municipal Court has two judges. R.C. 1901.08; Def.Ex. 7 at 6.

30. The Dayton Municipal Court has jurisdiction within the City of Dayton. R.C.1901.02(A). Def.Ex. 7 at 6. The Dayton Municipal Court has five judges. R.C. 1901.08; Def.Ex. 7 at 6.

31. The Franklin County Municipal Court has jurisdiction within Franklin County. R.C.1901.02(A), (A)(5), & (B); Def.Ex. 7 at 6. The Franklin County Municipal Court has fourteen judges. R.C. 1901.08. One of the judges of the Franklin County Municipal Court is assigned to that court's Environmental Division. R.C. 1901.011, 1901.031, & 1901.051(C). Def. Ex. 7 at 6.

32. The Toledo Municipal Court has jurisdiction within the City of Toledo, the Village of Ottawa Hills, and Washington Township in Lucas County. R.C. 1901.02(A) & (B); Def.Ex. 7 at 6. The Toledo Municipal Court has seven judges. R.C.1901.08; Def.Ex. 7 at 6. One of the judges of the Toledo Municipal Court is assigned to that court's Housing Division. R.C.1901.011, 1901.031, & 1901.051(B); Def.Ex. 7 at 6.

33. The Youngstown Municipal Court has jurisdiction within the City of Youngstown. R.C.1901.02(A); Def.Ex. 7 at 7. The Youngstown Municipal Court has three judges. R.C.1901.08; Def.Ex. 7 at 7.

34. Pursuant to R.C.1907.01, county courts are created in each county in which the territorial jurisdiction of a municipal court or courts is not coextensive with the geographical boundaries of the county. Def.Ex. C at 3–4. These county courts have jurisdiction throughout those parts of the county which are not subject to the territorial jurisdiction of any municipal court. Def.Ex. C at 4.

35. The Dayton, Kettering, Miamisburg, Oakwood, and Vandalia Municipal Courts are within Montgomery County, but their combined territorial jurisdiction is not coextensive with the geographical boundaries of that county. R.C.1901.01 & 1901.02(B). Because portions of Montgomery County are not within the territorial jurisdiction of any of the municipal courts within that county, Montgomery County has a county court. R.C.1907.01

36. R.C.1907.11 establishes the number of judges for each county court. Def.Ex. C at 3. The Montgomery County Court has five part-time judges. R.C.1907.11(A).

37. Under R.C.1907.15(A)(1), the Court of Common Pleas in a county with a county court having more than one judge may divide the county court into separate districts and assign a specific judge or judges to each district so created. The Court of Common Pleas for Montgomery County has so divided the Montgomery County Court into two districts and has assigned three judges to District # 1, the court challenged by the Plaintiffs herein. *See In re Montgomery County Court* (Montgomery C.P. April 26, 1994); Def.Ex. 3; Def. Ex. 7 at 8. Under the Montgomery County Court of Common Pleas' order, the territorial jurisdiction of Montgomery County Court District # 1 includes the City of Trotwood, the Villages of Brookville, Farmersville, New Lebanon, Phillipsburg, and Verona (the portion in Montgomery County), and Clay, Jackson, Jefferson, Madison, and Perry Townships in Montgomery County. *Id.*

38. The basic structure of Ohio's state court system, under which territorial jurisdiction is based solely on geography, dates

to the 1850's when race was not an issue in the structure of state government in Ohio. Tr. at 1075, 1502–03, 1606–07. The territorial jurisdictions of the Ohio courts are race-neutral, *i.e.*, they are based solely on geography and not on population or the racial composition of the population within the respective jurisdictions. Def.Ex. B at 3; Def.Ex. C at 5; Tr. at 964–65, 1075, 1502–03.

### Ohio's Judicial Electoral Scheme

39. Under Article IV, § 6(A), of the Ohio Constitution, the electoral districts of all state courts are "linked" to the territorial jurisdictions of the courts. Tr. at 955–56, 1503–04; Def .Ex. B at 3–4; Def.Ex. C at 4–5. Specifically, the judges of the Ohio Supreme Court are elected by the electors of the state in at-large elections, judges of the courts of appeals are elected by electors of their respective appellate districts in at-large elections, and judges of the courts of common pleas, and the divisions thereof, are elected by the electors of the counties. Def.Ex. C at 4; Tr. at 955–56. Various statutes provide for the election of municipal court and county court judges by electors within the courts' respective territorial jurisdictions. R.C. 1901.07(B), 1901.08, 1907.11, & 1907 .13. Def.Ex. C at 4.

40. Like the territorial jurisdiction of Ohio's courts, the electoral districts of Ohio's courts are race-neutral, *i.e.*, they are based solely on geography and not on population or the racial composition of the population within the respective jurisdictions. Def.Ex. B at 3–4; Def.Ex. C at 5; Tr. at 965, 1075, 1502–03, 1505.

41. Candidates for the courts of common pleas, municipal courts, and county courts must reside in the district of the court to which they seek election. Ohio Const., Art. IV, § 6(B); R.C. 2301.01, 1901.06 and 1907.13. Def.Ex. C at 4. A county court judge must reside within the jurisdiction of the county court, but in counties divided by the common pleas court into areas of separate jurisdiction

pursuant to R.C.1907.15(A)(1), the judge need not reside in the area of separate jurisdiction to which he or she is assigned. R.C.1907.13

42. Candidates for the courts of appeals, courts of common pleas, and municipal courts must be admitted to practice law in the state and must have been engaged in the practice of law for a minimum of six years. R.C. 2501.02, 2301.01, and 1901.06. Def.Ex. C at 4; Tr. at 163–64, 957–58. Candidates for county court must be admitted to practice law in the state and must have been engaged in the practice of law for two years. R.C.1907.13; Def.Ex. C at 4. Under Article IV, § 6(C) of the Ohio Constitution, no judicial candidate may serve if that candidate attains the age of 70 years on or before the date the candidate takes office. Def.Ex. C at 4; Tr. at 957.

43. The qualifications for judicial candidates—age, residency, admission to practice law and years of practice—are all race-neutral. Def.Ex. B at 4; Def.Ex. C at 5; Tr. at 965–66, 1505.

44. With a few minor exceptions, judicial candidates in Ohio run for "numbered posts," *i.e.*, they are candidates for specific judicial seats. Tr. at 1018–19. This practice of not pitting incumbent judges against one another promotes collegiality among judges and avoids voter confusion. Tr. at 1017–19.

45. Judicial candidates in Ohio run in the general election on a "nonpartisan" ballot, *i.e.*, judicial candidates' party affiliation does not appear on the general election ballot. R.C. 3505.04 & 1901.07(A), Def.Ex. C at 4; Tr. at 953, 956–57. Judicial elections are, nonetheless, intensely partisan. Tr. at 953, 970, 1510.

46. Candidates for Supreme Court justice, court of appeals judge, and common pleas judge run in partisan primary elections. Def.Ex. C at 7; Tr. at 957.

47. Candidates for municipal court judge may be nominated either by nomi-

nating petition or by primary election subject to charter provisions. Def.Ex. C at 4; Tr. at 957. Certain municipal judicial candidates must be nominated by petition signed by a specified number of electors, including Toledo (1000 electors), R.C. 1901.07(C)(2), Akron (250 electors), R.C. 1901.07(C)(3), and Franklin County (1000 electors), R.C.1901.07(C)(5). Def.Ex. C at 4; Tr. at 844, 957, 1113.

48. County court judicial candidates must be nominated by petition of 1% of the electors of the jurisdiction voting in the most recent gubernatorial election. R.C. 1907.13. Def.Ex. C at 4.

49. The Democrat and Republican parties, and the judicial candidates themselves, actively communicate the candidates' party affiliations to the voters. This information is communicated to the voters via party sample ballots or slate cards, as well as other campaign literature and media. Def.Ex. C at 7; Tr. at 336, 970–71, 1217, 1266, 1510–11.

50. The nominating processes for judicial candidates—either by primary or nominating petition—are race-neutral. Def. Ex. B at 4; Def .Ex. C at 5; Tr. at 966, 1505, 1608. Plaintiffs acknowledge that there are no racially discriminatory barriers imposed by the nominating process itself. See Def.Ex. 22 at 3–5, Nos. 5 and 8; Tr. at 1505.

51. The Governor appoints judges to fill vacancies in any judicial position. Ohio Const. Art. IV, § 13; Def.Ex. C at 5, Tr. at 960, 969. See also *Newman v. Voinovich,* 789 F.Supp. 1410, 1412 (S.D.Ohio 1992), *aff'd,* 986 F.2d 159 (6th Cir.), *cert. denied,* 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993). Governors of both political parties typically fill such vacancies with members of the Governor's political party, regardless of the partisan leanings of the judicial district in which the appointee will be serving. Def.Ex. C at 6; Tr. at 969; *Newman,* 789 F.Supp. at 1412. Gubernatorial appointees hold office until the next general election, at which time they must seek election to fill any remainder of an unexpired term. Ohio Const., Art. IV, § 13. Both the current Ohio Governor, Defendants Voinovich, a Republican, and his predecessor, Governor Richard F. Celeste, a Democrat, actively sought to appoint qualified African–Americans to judicial vacancies. See *Newman,* 789 F.Supp. at 1416; Tr. at 418, 636–37.

52. There are significant differences between judicial and legislative or executive branch elections in Ohio. Def.Ex. C at 5; Tr. at 152, 334–35, 966, 1504. Candidates for judicial office are governed by the Ohio Code of Judicial Conduct. Def. Ex. 4; Def.Ex. C at 5; Tr. at 152, 1508. Plaintiffs' and Defendants' witnesses agree that, pursuant to Canon 7, judicial candidates are precluded from running on issue-oriented platforms or from making pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office. Def.Ex. B at 4; Def.Ex. C at 5; Tr. at 51–52, 152–53, 334–35, 677, 817, 873, 958, 1506–07. Canon 7 is widely seen as protecting the integrity and perceived fairness that is so important to the judiciary. Def.Ex. C at 5. Candidates can and do often run on "law and order" or "tough but fair" judicial campaign themes. Tr. at 493, 1229, 1267, 1513, 1611.

53. Judges are not "representatives" in the sense that they will represent the will of the electors. Tr. at 335, 958–60, 966, 1506. Judges cannot and should not cater to a particular "constituency." Tr. at 335, 959, 966, 1013–14, 1334, 1506, 1573–74, 1609.

### Factors Generally Influencing the Outcome of Judicial Elections in Ohio

54. Judicial elections in Ohio are typically described as "down-ticket" races. Tr. at 248, 1139, 1216–17. As "down-ticket" races, the voters generally have relatively little information concerning the candidates for judicial office, Tr. at 248, 1139, 1216–17, 1510–11, 1517, and because of the restrictions of Canon 7, the ability of judi-

cial candidates to campaign on issues and communicate positions on issues to the voters is severely limited. Tr. at 51, 152–53. Accordingly, a number of other factors generally play a significant role in the outcome of judicial elections in Ohio.

55. Political Affiliation. Through a variety of "partisan cues," the political affiliation of judicial candidates becomes known to voters and clearly plays a significant, Tr. at 139, 182, 191, 415, 631–32, 662, 1157, 1314, if not predominant, role in the election of judges. Def.Ex. B at 5; Def.Ex. C at 7; Tr. at 970–71, 1509–10, 1542. These "partisan cues" include party endorsements, distribution of political party sample ballots, and the like. Def.Ex. C at 7; Tr. at 970–71, 1217, 1266, 1510–11. As a result, judicial elections are, in reality, highly partisan affairs in which each political party attempts to elect its own candidates. Tr. at 953, 972, 1510. Generally, a Republican judicial candidate running for election in a Republican leaning county, such as Franklin or Hamilton Counties, enjoys an advantage over a Democratic candidate in the same election, regardless of the race of the candidate or voters. Def.Ex. A at 17; Tr. at 971–72, 993. A Democratic candidate running in a Democratic leaning county, such as Cuyahoga County, enjoys a similar advantage. Def. Ex. A at 17; Def.Ex. C at 7; Tr. at 106, 971–72, 1547. Further, because many of the geographical districts from which judges are elected are heavily Republican or heavily Democratic, it is not surprising that there are frequently uncontested elections or elections in which there is no *meaningful* competition for a judicial seat. Tr. at 109, 972.

56. Incumbency. Typically in judicial elections in Ohio, an elected or appointed incumbent enjoys an advantage. Def.Ex. B at 5; Def.Ex. C at 6; Tr. at 139, 182, 191, 415–16, 629, 640, 662, 968, 1111, 1215–16, 1237, 1314–15. As evidenced by Def. Ex. 16, most incumbent judges in Ohio, black and white, easily win reelection. This exhibit is consistent with the history of the high rate of reelection for incumbent judges in Ohio. See L. Baum, *The Electoral Fates of Incumbent Judges in the Ohio Court of Common Pleas,* 66 Judicature 420 (1983). Elected incumbents have the highest probability of winning reelection. Def. Ex. C at 6. Elected incumbents tend to have a higher name recognition than a challenger, a very important advantage in judicial elections where less information is available to voters concerning the candidates. Def.Ex. C at 6; Tr. at 629, 968–70, 1514. Elected incumbents also have an advantage in campaign organization, fundraising, and experience in campaigning. Def.Ex. C at 6; Tr. at 968–69. Appointed incumbents also enjoy a significant advantage over challengers, but do not have the same degree of advantage as elected incumbents. Def.Ex. C at 6. Non-incumbent challengers typically face the greatest barriers to election. Def.Ex. C at 6. Non-incumbent challengers typically are less known and less experienced candidates. Def.Ex. C at 6. Where there is an open seat judicial contest in which no incumbent is running, the partisan makeup of the judicial district is the most important determinant in the outcome in these races. Def.Ex. C at 6.

57. Judicial Experience/Qualifications. A typical pattern in judicial elections is for a candidate to run for lesser judicial office and then to seek election to a higher judicial office as the candidate gains name recognition, experience and electoral success. Def.Ex. B at 5; Def.Ex. C at 7; Tr. at 972, 1514. Jurists who have served on a lower court are typically more-well known than those individuals who have not served on the bench, Tr. at 968, 1514, and those jurists who perform well are more likely to receive newspaper endorsements and bar recommendations. Def.Ex. C at 7. Canon 7 does permit a judicial candidate to communicate the candidate's judicial experience and qualifications to the voters, and in these relatively low-information races, such experience and qualifications takes on added importance. Tr. at 873, 1513.

58. Endorsements. Endorsements by newspapers, bar associations, and community groups also provide the voter with key information in a contest that is typically characterized by a low level of information. Def.Ex. C at 7; Tr. at 191, 662, 1111, 1157–58, 1215, 1261–63, 1314. Judicial candidates often feature such endorsements in their campaign advertising. Tr. at 989.

59. Name Recognition/Familiarity. Name recognition is often an important factor in the less publicized judicial contests. Def.Ex. B at 5; Def.Ex. C at 4; Tr. at 50, 121, 181, 923, 1111, 1157, 1315, 1509–10. Name recognition can arise from a number of sources including previous experience in politics and elections, active involvement in civic and social activities or simply the good fortune of a well-recognized family name. Def.Ex. C at 7; Tr. at 115–16, 420, 495–97, 1215–16, 1509–10. Both whites and African–Americans are hesitant to run against candidates who have "strong judicial names." Pl.Ex. 37 at 8–9; Tr. at 138.

60. Quality of Campaign Waged. While partisanship, incumbency, and name recognition are critical factors in determining the outcome of judicial elections, a challenger without these resources may still be successful with a good campaign. Def.Ex. B at 10; Def.Ex. C at 7; Tr. at 181–82, 191, 416, 662, 1111–12, 1157, 1315, 1515, 1517. In the evidence presented, there are many examples of non-incumbent challengers or members of the minority party winning an election because the candidate ran an effective campaign. Tr. at 765, 973–74, 987–90, 994–95, 1164–65, 1225–27. Although not always, the quality of campaign waged depends in large part upon the resources and financing available to the candidate. Tr. at 50, 416, 1157, 1216, 1509–10.

61. Party Recruitment/Slating. In Ohio judicial elections, political party organizations have played a positive role in actively recruiting and supporting black candidates for election to judicial office. Def.Ex. B at 5; Def.Ex. C at 7; Tr. at 399–404, 974, 1112–13, 1315–16, 1325–26. Both major political parties have actively recruited minority judicial candidates, Tr. at 399, 1112–13, 1133, 1136, 1158, although, because most African–Americans identify themselves as Democrats, Tr. at 1133, 1149–50, 1539–40, the Republican party has generally had a more difficult time in attracting African–American candidates. Tr. at 1134–34, 1279–80. One difficulty in recruitment, however, is the relatively small pool of qualified black judicial candidates. Tr. at 400, 974. See Findings of Fact at ¶¶ 109, 144, 167, 192, 215, 236, 262, 285. The Ohio Supreme Court's Commission on Racial Fairness has determined that of the approximately 31,000 registered attorneys in Ohio, only 1,100, or approximately 3.5%, are "attorneys of color." Tr. at 129–30. Because "attorneys of color" include African–Americans, Latinos, Asian/Pacific Islanders, and Native Americans, the number of African–American attorneys is actually less than 1,100 or 3.5%. Tr. at 130.

62. Voter Turnout/Roll–Off. Turnout in elections varies with each election year and can be a factor in judicial contests. Def.Ex. B at 5; Def.Ex. C at 8; Tr. at 975. Another factor is "roll-off," which occurs when more votes are cast at the top of the ticket than in lower level judicial races. Def.Ex. B at 5; Def.Ex. C at 8; Tr. at 975–76, 1517.

63. Controversies/scandals. In certain elections, a judicial candidate may be disadvantaged because of unfavorable publicity concerning the candidate or his or her candidacy. Tr. at 629, 1158, 1515–16. Controversies or scandals surrounding a candidate, including some incumbent judges, may enable a challenger to defeat a more well-known and better financed candidate. Tr. at 1515–16.

64. Gender. Although evidence of the precise effect of the candidate's sex was not presented, several witnesses testified that, sometime beginning in the 1980's,

female judicial candidates enjoyed a measurable advantage over their male counterparts. Tr. at 424, 509, 1114–15, 1171, 1227.

65. **Race.** The race of the a judicial candidate and voters plays a role in determining the outcome of judicial elections in Ohio, Tr. at 1432, 155, 976, 1030, 1051, 1517–18, 1613, but in most judicial elections, does not play a predominant or significant role. Tr. at 1181, 1241, 1261, 1267, 1271, 1325, 1389–90, 1518–21, 1613.

### Analysis of Racial Bloc Voting in General

66. The "secret ballot" precludes the compilation of official statistics as to why voters vote as they do in any particular election. Def.Ex. A at 8; Tr. at 1364. To determine the degree of racially polarized voting, one must conduct a statistical or other empirical analyses of the election results for each election at issue. Tr. at 949–50, 982, 1481.

67. "Racially polarized voting" is essentially the degree to which black and white voters, as groups, vote differently. Tr. at 1359. The analysis of racial bloc voting addresses the final two *Gingles* preconditions, *i.e.*, the "political cohesion" of the minority group and the degree of white bloc voting. "Political cohesion" is generally when the members of a protected minority group tend to vote the same way for elected office most of the time, Tr. at 1355, 1444, 1535–36, *i.e.*, when the minority group consistently or regularly has a "clear candidate of choice."

68. "Candidate of choice" is the candidate preferred by African–American voters, be the candidate white or black, Democrat or Republican. Tr. at 436, 1399, 1538. There is no consensus as to the candidate of choice of African–American voters, Tr. at 1087–88, 1356, even among the class representatives in this case. Plaintiffs Jeffrey Johnson, Charles Cross, and William Mallory testified that their preferred candidate is a Democrat. Def. Ex. 23(A) at 32; Def.Ex. 23(F) at 31; Def. Ex. 23(H) at 36; Tr. at 224. Plaintiffs

Gooding, Johnson, and Jones testified that their preferred candidate, all other things being equal, is an African–American. Def. Ex. 23(D) at 12; Def.Ex. 23(E) at 47; Tr. at 392–93, 435. Most of the class representatives testified that their primary determinant was the qualifications of the individual, with political affiliation and race being secondary factors. Def.Ex. 23(B) at 27; Def.Ex. 23(C) at 13, 41; Def.Ex. 23(D) at 13–14; Def.Ex. 23(G) at 19–20; Def.Ex. 23(I) at 25; Tr. at 330, 658, 703–04.

69. The Plaintiffs in this case have offered no statistical evidence of racial bloc voting. Tr. at 659, 949, 982, 1361, 1412, 1500, 1521, 1627–28. Plaintiffs' witnesses generally testified as to their *belief* that "blacks tend to vote for blacks and whites tend to vote for whites." Tr. at 141, 154–55, 167–68, 324, 392, 492, 509, 566, 687, 728–29, 731, 914–15. The only "statistical" evidence offered by Plaintiffs is entitled "An Analysis of Judicial Contests for the Common Pleas Court of Cuyahoga County, Ohio, Involving at Least One African American Candidate from 1974–1996" complied by Ronald B. Adrine, Judge of the Cleveland Municipal Court. Pl.Ex. 37 ("Adrine Report") As discussed in detail below, the Adrine Report is limited to Court of Common Pleas for Cuyahoga County, Tr. at 95, and, in any event, does not constitute valid statistical evidence upon which this Court could find the existence of legally significant racial bloc voting.

70. Defendants' expert, Dr. Gary King, has conducted exhaustive statistical analyses of all the districts subject to challenge and all elections within the twenty challenged courts from 1985 to 1995. Def.Ex. A; Tr. at 1371–72. Dr. King chose the time period of 1985 to 1995 because this time period is probative of recent judicial elections and the election results can be correlated with the 1990 Census data. Tr. at 1372. Election results outside of the this time period were not used because of the great difficulty in matching census

data to electoral data prior to 1985. Def. Ex. A at 12; Tr. at 1372.

71. Dr. King obtained precinct level data for all judicial elections between 1985 and 1995. Def.Ex. A at 12; Tr. at 1371–73. The precinct level data was then organized, tabulated, processed, sorted, and keypunched. Def.Ex. A at 12; Tr. at 1372. The electronic data were then matched to 1990 demographic data from the 1990 Census. Def.Ex. A at 12; Tr. at 1374. The data were then subject to statistical analysis to estimate the degree of racially polarized voting in each election. Def.Ex. A at 12; Tr. at 1374.

72. Dr. King is currently a Professor of Government at Harvard University in Cambridge, Massachusetts, Def.Ex. A at 2; Tr. at 1344, 1346, and serves as the Director of the Harvard/MIT Data Center. Def .Ex. A at 2; Tr. at 1346. Dr. King is the world's foremost expert in the statistical analysis of racial bloc voting. Tr. at 1600. Dr. King has verified his methodology and analysis using known individual level data, Def.Ex. A at 10–13, Tr. at 1369–71. His methodology and analysis has been used and relied upon by, *inter alia,* the United States Department of Justice, Tr. at 1353, and has been independently verified by Dr. King's colleague at Harvard University and researchers at Washington University in St. Louis, the University of Wisconsin, the University of California at Berkeley, Stanford University, the University of Michigan, and the University of Essex in England. Tr. at 1468.

73. Dr. King's method is described in his Report, Def.Ex. A at 8–12, and in his trial testimony. Tr. at 1364–82. Dr. King's method is a type of "regression analysis" that involves a combination of a number of scientifically and legally accepted methods, including bivariate ecological regression and homogeneous precinct analysis. Tr. at 1468–70. Dr. King's methodology constitutes an improvement upon the "Goodman's regression" method of analysis that was used by the experts in *Gingles*

and ultimately relied upon by the United States Supreme Court. Def.Ex. A at 10–11; Tr. at 1367–68, 1382. Dr. King's methodology does not yield statistically impossible results as does "Goodman's regression." Def.Ex. A at 10; Tr. at 1368, and is the best method currently available to measure racial bloc voting. Tr. at 1449, 1470.

74. The statistical results are reflected in Tables 3 and 4 of Dr. King's Report. Def.Ex. A; Tr. at 1375. Table 3 provides an analysis of every general election in the challenged courts over the previously described time frames. The Table lists the judicial elections, the candidates, the party affiliation of the candidates and the Democratic percentage of the two-party vote. Def.Ex. A at 15; Tr. at 1376–77. The last two columns provide the percentage of blacks voting Democratic and the percentage of whites voting Democratic. Tr. at 1377–79. This information is estimated by statistical technique with a standard of error of 1%. Tr. at 1378. Table 4 provides compilations of the data presented in Table 3. Tr. at 1388, 1400.

75. The "degree of racial bloc voting" is the difference between the percentage of blacks who voted for the Democratic candidate and the percentage of whites who voted for the Democratic candidate, *i.e.,* the final two columns in Table 3 of Dr. King's Report. Tr. at 1039–40, 1379, 1461. See also *Clarke v. City of Cincinnati,* 40 F.3d 807, 816–17 (6th Cir.1994) (Boggs, J., concurring), *cert. denied,* 514 U.S. 1109, 115 S.Ct. 1960, 131 L.Ed.2d 851 (1995).

76. Based upon this data and his statistical analysis, Dr. King concluded that there does not appear to be a consensus as to African–Americans' "candidate of choice." Def.Ex. A at 7; Tr. at 1357. See also Tr. at 980–81, 1537–38. There are occasions when African–American voters support white Democrats, black Democrats, white Republicans, and black Republicans, and consequently, Dr. King was unable to conclude that the "candidate of

choice" is always a Democrat, always a Republican, always white, or always black. Def.Ex. A at 7; Tr. at 1357–58. See also Tr. at 981.

77. Based upon this data and his statistical analysis, Dr. King concluded that there is a degree of racial bloc voting in virtually every judicial election in the eight most populous counties. Def.Ex. A at 16; Tr. at 1359, 1461. See also Tr. at 1541. There is generally a degree of racial bloc voting in every election, Tr. at 1360, because, by definition, the only elections in which there is not a degree of racial bloc voting are those elections in which white and black voters, as groups, vote exactly the same. Tr. at 1066–67.

78. Dr. King further concluded that the degree of racial bloc voting varies widely, from county to county, court to court, and election to election. Def.Ex. A at 16, 18; Tr. at 1360, 1362, 1379. See also Tr. at 977, 983–84, 1040, 1543. Black candidates routinely receive a significant portion, and sometimes a majority, of the votes cast by white voters, or so-called "white cross-over votes." Def.Ex. A at 18; Tr. at 984. The data does not support the testimony of Plaintiffs' witnesses that blacks usually vote for blacks and whites usually vote for whites in judicial elections. Tr. at 1001, 1049–50, 1379–80, 1521.

79. Dr. King also calculated an "average degree of racial bloc voting" for each of the counties at issue herein. The "average degree of racial bloc voting" is the difference between the average percentage of African–Americans who vote for the Democratic candidate over all of the elections analyzed by Dr. King and the percentage of whites who voted for the Democratic candidate over the same elections. Tr. at 1403–04. These "average degrees of racial bloc voting" are reported in Table 4 of Dr. King's Report and are discussed below.

80. Dr. King also concluded that when African–American judicial candidates run as the candidates of the majority party in a particular county or judicial district, they are generally successful. Def.Ex. A at 17; Tr. at 1390. For example, black Democrats running in heavily Democratic Cuyahoga County and black Republicans running in heavily Republican Franklin County are generally successful in both primary and general elections. Def.Ex. A at 17; Tr. at 1390, 1406–07, 1547.

81. Dr. King testified that to determine whether a degree of racial bloc voting is "legally significant," one must determine the extent or size of the racial bloc voting over time, see Findings of Fact ¶ 82, and whether the minority group's preferred candidate is consistently defeated. Tr. at 1360, 1362. See also Tr. at 1540–42. "Legally significant racial bloc voting" must be determined over a number of elections, and there is no level at which the degree of racial bloc voting becomes "legally significant" in a single election. Tr. at 1461–63, 1544.

82. Dr. King concluded that there is no *legally* significant racially polarized voting, that is a white bloc vote which will *usually* or *normally* defeat the *combined* strength of minority support plus "white crossover votes," in any of the challenged districts. Def.Ex. A at 16–18; Tr. at 1388–89, 1391–92, 1413. See also Tr. at 1540, 1599–1600. King further testified that race was not the predominant factor affecting the outcome of judicial elections in Ohio Tr. at 1389–90. See also Tr. at 981–83. The candidate preferred by African–American voters is sometimes elected and sometimes not elected. Tr. at 1389–90. See also Tr. 981–83, 1600. If race were the predominant factor in Ohio judicial elections, Dr. King's results would look very different. Tr. at 1389–90. See also Tr. at 1523–24, 1543–44. The "clear partisan patterns" reflected in Dr. King's Report suggests that party affiliation is a, if not the, predominant factor in Ohio judicial elections. Tr. at 977, 1389, 1416.

83. Dr. Asher testified that black candidates running unopposed is indicative of the absence of racial bloc voting, because

if, in fact, legally significant racial bloc voting existed in a particular district, ambitious white candidates would eagerly run against black candidates. Tr. at 1001, 1083–86.

84. Dr. King and Defendants' other experts testified that his statistical analysis is not the only method of assessing the existence and degree of racial bloc voting. Tr. at 1363–64, 1583. All three agreed, however, that Dr. King's method is the most accurate method of estimating racial bloc voting from aggregate data, *i.e.*, precinct level election returns and census data. Tr. at 1032–34, 1449, 1470, 1585.

85. One such alternative method suggested by Plaintiffs involves surveys or polling. Tr. at 1030–32, 1420, 1500, 1584–85. Dr. Herbert Asher, Professor Emeritus of Political Science at The Ohio State University, Def.Ex. C at 1; Tr. at 939, and a nationally recognized expert on American and Ohio Politics, Def.Ex. C at 1 and Exhibit 1, Tr. at 944–47, and Dr. Alfred John Tuchfarber, a Professor of Political Science at the University of Cincinnati, Director of the University of Cincinnati's Institute for Policy Research, Tr. at 1478, and a nationally recognized expert in political surveys and survey techniques, Tr. at 1482, concurred with Dr. King's conclusion that surveys are not a particularly reliable method of assessing racial bloc voting. Tr. at 1030–32, 1363–64, 1420–21, 1425–26, 1428, 1585. For whatever reason, a significant number of respondents in political polls or surveys do not give accurate responses to questions in such surveys, Tr. at 1428, 1585, particularly when such polls or surveys involve race or racial issues. Tr. at 1425–26.

86. Even though Plaintiffs suggested that surveys or polls might be an alternative method of assessing racial bloc voting, they did not present any evidence that they conducted any such surveys or polls with regard to any of the issues in this case. Tr. at 1500.

## "Chilling Effect"

87. At trial, a number of Plaintiffs' witnesses testified generally that potential African–American judicial candidates are "chilled" or discouraged from seeking judicial office due to the perception that black candidates cannot overcome white bloc voting and be elected. Tr. at 71, 137, 161, 324, 377–78, 388, 741–42, 835–36. Plaintiffs offered no statistical or empirical evidence supporting this testimony.

88. Because candidates who do not run cannot be elected, it is impossible to statistically measure this so-called "chilling effect." Tr. at 1363, 1457–58, 1647–48. Rather, a valid statistical analysis must be based upon the results of actual election contests. Tr. at 1363.

89. This so-called "chilling effect" is not supported by the actual election results. Tr. at 1019–20, 1071–74, 1578–80, 1645. As discussed below, African–American judicial candidates have won 80 of 123, or 72.3%, of the judicial primary elections involving at least one African–American candidate in the twenty challenged courts. Def.Ex. 15 at 51; Tr. at 1413–14, 1566. African–American judicial candidates have won 66 of 115, or 57.4%, of the general elections involving at least one African–American candidate in the twenty challenged courts. Def.Ex. 15 at 51; Tr. at 1414, 1567. See Findings of Fact ¶ 110. Accordingly, African–American attorneys are actually statistically more likely to be elected to judicial office than their white counterparts. Tr. at 1578–81, 1663.

## Totality of Circumstances Factors in General

90. As discussed below, the Supreme Court in *Gingles* directed courts to assess a number of factors in determining whether, under the totality of the circumstances, members of a minority group have an equal opportunity to participate in the political process and to elect their candidates of choice. Those factors are listed in the Senate Report accompanying the 1982 amendments to the Voting Rights Act and

include: (1) the history of voting-related discrimination in the State or political subdivision; (2) the extent to which voting in the elections of the State or political subdivision is racially polarized; (3) the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) the extent to which the elected officials are unresponsive to the particularized needs of the members of the minority group; and (9) whether the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous. *Thornburg v. Gingles,* 478 U.S. 30, 44–45, 106 S.Ct. 2752, 2763–64, 92 L.Ed.2d 25 (1986).

### History of Voting–Related Discrimination in Ohio

91. The Plaintiffs have not asserted that there is any recent history of voting-related discrimination in Ohio. See Def.Ex. 22 at 3–4, No. 5. Drs. Asher and Tuchfarber testified that there was, in fact, no such recent history of voting-related discrimination. Def.Ex. B at 10; Def.Ex. C at 11; Tr. at 1011–13, 1568–69, 1606–07, 1648. Judge Adrine testified that he was unaware of any such discrimination. Tr. at 121–22.

92. In *Mallory v. Eyrich,* 717 F.Supp. 540 (S.D.Ohio 1989) *appeal dismissed,* 898 F.2d 154 (6th Cir.1990), the United States District Court for the Southern District of Ohio, Western Division, approved the subdistricting of the Hamilton County Municipal Court following the state's and county's confession of judgment on the claim under § 2 of the Voting Rights Act. See Def.Ex. 14; Tr. at 205–07, 227–31, 1489–92.

93. In *Armour v. Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991), a three-judge United States District Court for the Northern District of Ohio concluded that the 1981 Ohio House of Representatives districts in Mahoning County violated § 2 of the Voting Rights Act, the Fifteenth Amendment to the United States Constitution, and Article XI of the Ohio Constitution. The state did not appeal the district court's ruling. See Def.Ex. 13; Tr. at 260–64, 285–96, 301–04, 1493–95.

94. In *Voinovich v. Quilter,* 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), the United States Supreme Court found no legally significant racial bloc voting in Ohio legislative elections and, therefore, no Voting Rights Act violation in the reapportionment of Ohio's legislative districts following the 1990 census. See Def. Ex. 12; Tr. at 237–38, 1497.

95. In *Clarke v. City of Cincinnati,* 40 F.3d 807 (6th Cir.1994), cert. denied, 514 U.S. 1109, 115 S.Ct. 1960, 131 L.Ed.2d 851 (1995), the Sixth Circuit affirmed the United States District Court for the Southern District of Ohio's determination that the at-large election of Cincinnati City Council members did not violate § 2 of the Voting Rights Act or the Fourteenth Amendment to the United States Constitution. Tr. at 253–54, 1492–93.

96. In *State, ex rel. Rogers v. Taft,* 64 Ohio St.3d 193, 594 N.E.2d 576 (1992), the Ohio Supreme Court rejected a Voting Rights Act and Fifteenth Amendment challenge to the at-large election judges and county commissioners in Mahoning County. Def.Ex. 26; Tr. at 296–97, 304–06.

### Extent of Racially Polarized Voting in Ohio

97. The Court has previously discussed the extent of racial bloc voting in Ohio judicial elections. The Court further discusses below the extent of racial bloc voting in each of the counties at issue herein.

### Use of Voting Practices or Procedures that Enhance the Opportunity for Discrimination

98. The only voting practice or procedure which Plaintiffs assert enhances the opportunity for discrimination against African–Americans is the use of at-large judicial election districts linking the territorial jurisdiction of the courts at issue herein. Def.Ex. 22 at 4–5, No. 7; Def.Ex. B at 10; Tr. at 1569–70, 1650.

### Candidate Slating/Recruitment Process

99. There is no evidence that minorities have been excluded from the candidate slating processes of the major political parties. Def.Ex. B at 11; Tr. at 122–23, 1012–13, 1315–16, 1325–26, 1570, 1608–09, 1650.

100. Indeed, both political parties in Ohio have actively recruited African–American judicial candidates. Def.Ex. B at 11; Tr. at 1306, 1650. The individual efforts of the county political parties are discussed below.

### Effects of Past Discrimination in Education, Employment, and Health

101. Numerous witnesses testified that African–Americans have suffered a history of discrimination in housing, education, employment, and health in Ohio. Tr. at 319–20, 323–24, 373–74, 528–36, 552–54, 580–84, 724–26, 768–75, 803–09, 859–60, 863–68.

102. Plaintiffs' expert witness Dr. Robert L. Green, Professor of Social Work at Case Western Reserve University, Tr. at 881, generally outlined the history of discrimination against African–Americans in the United States, and with little specificity, in Ohio. Tr. at 804–922. Discrimination against African–Americans in housing, education, employment, and health has occurred in each of Ohio's eight most populous counties.

103. Plaintiffs have directed this Court's attention to numerous reported judicial decisions containing official findings of discrimination against African–Americans in each of Ohio's eight most populous counties. Pl.Exs. 3–9, 11–14, 16–17; Tr. at 47–48, 319–20, 321–24, 373–74, 480–83, 519–21, 553–54, 560–61, 580–81, 722–23.

104. Ohio's history of discrimination against its African–American citizens is not the subject of serious dispute among the parties. Defendants' witnesses acknowledged that African–Americans in Ohio have suffered discrimination in the areas of housing, education, employment, and health. Def.Ex. B at 11; Tr. at 1012, 1028–29, 1256–57, 1570–71, 1591–95. Nor is there any serious dispute that disparities remain among whites and African–Americans in several socio-economic categories as a result of such discrimination.

105. Most de jure forms of discrimination against African–Americans were repealed in the early part of this century. Def.Ex. B at 11; Tr. at 1595, 1651.

106. Plaintiffs have submitted no evidence which establishes that the effects of past discrimination deny African–Americans equal access to the political process or actually hamper the ability of African–Americans to participate in the political process. Def.Ex. B at 10. Dr. King testified that if housing and other forms of discrimination were a predominant or overwhelming factor in voting in judicial elections, then one would observe a degree of nearly 100% racial bloc voting, but that degree of racial bloc voting does not exist anywhere in Ohio. Tr. at 1456.

### Overt or Subtle Racial Appeals in Campaigns

107. Before trial, Plaintiffs did not contend that any Ohio judicial elections were

subject to overt or subtle racial appeals. Def.Ex. 22 at 8, No. 10; Tr. at 1511. At trial, Plaintiffs provided very few examples of judicial campaigns marked by overt or subtle racial appeals. Tr. at 62–63, 156, 242. Plaintiffs' witnesses further testified that most of these racial appeals "backfired," resulting in the election of the African–American candidate. Tr. at 113, 242–43, 631.

108. Drs. Asher and Tuchfarber found that there is little or no evidence of overt or subtle racial appeals having been used in Ohio judicial campaigns. Def.Ex. B at 11; Tr. at 1011–12, 1060–61, 1572, 1651–53. Accordingly, the Court finds that, in general, judicial campaigns have not been marked by overt or subtle racial appeals.

### Extent to Which Minorities have been Elected to Public Office

109. The Ohio Supreme Court's Commission on Racial Fairness reported in 1995 that 31 of the state's 677 state court judges, or approximately 4.6%, were African–American. Tr. at 131. At the same time, the Commission reported that only 1,100 of the state's 31,000 registered attorneys, or 3.5%, were "attorneys of color." Tr. at 129–30. Plaintiffs' witnesses Judge Ronald B. Adrine, Judge Carl J. Character, and Jesse Gooding serve on the Commission. Tr. at 64, 172, 689–90.

110. As reflected in Def.Ex. 15, as corrected during trial, African–American judicial candidates have won 80 of 123, or 72.3%, of the judicial primary elections involving at least one African–American candidate in the twenty challenged courts. Def.Ex. 15 at 51; Tr. at 1413–14, 1566–67. African–American judicial candidates have won 66 of 115, or 57.4%, of the general elections involving at least one African–American candidate in the twenty challenged courts. Def.Ex. 15 at 51; Tr. at 1414, 1567. These figures do not reflect all of the judicial elections in the each of the eight most populous counties, but are limited to the elections for the twenty challenged courts originally at issue herein.

For example, these totals do not include elections for the Cleveland Municipal, East Cleveland Municipal, or the University Heights Municipal Courts in Cuyahoga County, all of which have elected one or more African–American judges. Tr. at 1601–03.

111. In addition, African–Americans have been routinely elected to the Ohio General Assembly from majority white legislative districts with significant white cross-over votes, including some of the Plaintiff class representatives in this case. Def.Ex. 11; Tr. at 223–24, 245–46, 314, 316–17, 334, 395–96, 617–18, 656, 1013, 1572. This fact led the United States Supreme Court to conclude in 1993 that there was no legally significant racial bloc voting in Ohio legislative elections. *Voinovich v. Quilter*, 507 U.S. at 158, 113 S.Ct. 1149.

112. Kenneth Blackwell, an African–American Republican, has been elected Ohio Treasurer in a state-wide election. Tr. at 1213, 1572.

### Responsiveness of Elected Officials to the Particularized Needs of the Minority Group

113. Until trial, Plaintiffs made no allegation that judges of any of the challenged courts are not responsive to the particularized needs of the African–American community. Def.Ex. 22 at 8–9, No. 11; Def. Ex. B at 11.

114. As noted above, the only "responsiveness" judges are to show towards both black and white citizens is to be both fair and impartial. Judges and judicial candidates are forbidden from catering to any particular constituency. Tr. at 335, 959.

115. At trial, Plaintiffs' witnesses generally asserted that the lack of a number of African–American judges in proportion to the African–American population in the judicial districts undermined the African–Americans' perception of the fairness and impartiality of the judiciary. Tr. at 48–49, 72–74, 376, 542, 568–69, 571, 696–97, 746, 757, 832–33, 839–40. Plaintiffs' witnesses

also generally testified that it is important to have African–American judges because those judges are more familiar with African–Americans' experiences, lifestyles, attitudes, demeanors, mindsets, and customs, Tr. at 48, 71, 165–67, 324–25, 376, 541–43, 561, 569–70, 645, 650–51, 695–96, 742, 836–38, and can impart that familiarity and knowledge to other members of the judiciary. Tr. at 48–49, 72–73, 165–66, 326–27, 841–42. Plaintiffs' witnesses further testified that, in their opinions, having more African–American judges would enhance the perception of the fairness of the court system within the African–American community. Tr. at 74, 393, 541, 570–72, 651, 697, 730, 747, 840, 842. Other than a few isolated instances, however, Plaintiffs' witnesses did not testify that the judiciary, or any of its Caucasian judges, were other than fair and impartial towards African–American litigants. Tr. at 171–72, 545. Indeed, Plaintiffs' witnesses readily conceded that white judges can be, and are, fair and impartial to African–American litigants. Tr. at 335, 676, 744. Defendants' witnesses also testified that the judiciary is fair and impartial to litigants of all races and socio-economic backgrounds. Tr. at 1129, 1338.

### Ohio's Policy Underlying Jurisdiction–Wide At–Large Elections

116. Ohio has a substantial interest in maintaining the link between her courts' territorial jurisdictions and their electoral districts. Def.Ex. B. at 14; Def.Ex. C at 11–12; Tr. at 956, 1574–75. "Linkage" serves to foster the perception that Ohio's courts are fair and impartial. Tr. at 956, 1014–17, 1575. Tr. at 1578.

117. "Linkage" serves the state's legitimate and substantial interest in elected judges being accountable to all voters within their territorial jurisdiction. Tr. at 1578. This jurisdiction-wide accountability helps insulate judges from the pressures of special interest groups and particular segments of the electorate. Subdistricting along racial lines would only serve to de-stroy that interest, leaving judges elected from white majority districts beholden to white litigants who reside within the subdistrict and potentially unresponsive to black litigants who reside outside of the subdistrict. Tr. at 255, 1015–16, 1575–76. Conversely, judges elected from black majority districts would be beholden to black resident litigants and potentially unresponsive to white, nonresident litigants. Tr. at 255, 1098, 1575–76. Subdistricting would create or reinforce harmful racial stereotypes. Tr. at 238–39, 1575, 1659.

118. Because voters would only be permitted to cast votes for judicial candidates running in the subdistrict in which the voters reside, all voters, black and white, would be "disenfranchised" from voting for the other judges of the court, Tr. at 252, 1577, 1659–60, and would lose the important right to influence all of the judicial elections for the challenged courts. Tr. at 252, 442–43.

### Cuyahoga County–Gingles Preconditions

119. According to the 1990 Census, Cuyahoga County, and, therefore, the electoral districts for the Court of Common Pleas for Cuyahoga County and the Eighth Appellate district, have a total population of 1,412,140 and a black population of 350,185, or 24.80%. Def.Ex. 7 at 1, 2; Def.Ex. 8.

120. The City of Cleveland and Cuyahoga County are divided by the Cuyahoga River which runs from the southern boundary of the county north into Lake Erie. Tr. at 320–21, 483. Plaintiffs' witnesses familiar with Cuyahoga County testified generally that the African–American population in Cuyahoga County is concentrated east of the river, primarily in Wards 1–10 on the east side of the City of Cleveland and in several of the suburban communities contiguous with the east side of the City of Cleveland, while the Caucasian majority population is concentrated west of the river, primarily on the west side of Cleveland and in the western suburbs. Tr.

at 43–46, 79, 147–49, 317–18, 320–21, 364, 370–71, 483–85, 1245–47. Substantial white population is also located in suburban communities in the far eastern portion of the county.

121. Although the map of Cuyahoga County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district, Tr. at 1524–25, Defendants' experts conceded that African–Americans could constitute a majority in at least one geographically compact single-member district for the Cuyahoga County Court of Common Pleas and that it is probable that African–Americans could constitute a majority in at least one geographically compact single-member district for the Eighth District Court of Appeals. Tr. at 1526, 1626.

122. According to the 1990 Census, the electoral district for the Bedford Municipal Court has a total population of 80,024 and a black population of 25,629, or 32.03%. Def.Ex. 7 at 7; Def.Ex. 8.

123. The map of Cuyahoga County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district for the Bedford Municipal Court. *See* Tr. at 1526. Plaintiffs have offered no evidence on this issue with respect to the Bedford Municipal Court. Defendants' experts testified that, based upon Pl.Ex. 45, it appeared that the African–American population within the territorial jurisdiction of the Bedford Municipal Court was fairly evenly dispersed throughout most of the district and that it was unlikely that African–Americans could constitute a majority in a *geographically compact* single-member district for that court Tr. at 1526.

124. As noted above, the Defendants have presented no valid statistical evidence that African–Americans in Cuyahoga County are politically cohesive or of legally significant white bloc voting in Cuyahoga County. Plaintiffs presented no evidence of racial bloc voting, statistically valid or

otherwise with regard to the Court of Appeals for Cuyahoga County, Eighth Appellate District, or the Bedford Municipal Court.

125. The Adrine Report, which is limited to the Court of Common Pleas for Cuyahoga County, merely sets forth the county vote totals for races involving at least one African–American candidate. Tr. at 1050. It does not break down those vote totals by ward, precinct, or other political subdivision, Tr. at 94, or correlate those totals with census or other demographic data to establish a pattern of racial bloc voting. Tr. at 1050–51. In one race for which the Adrine Report does contain limited results from certain suburban communities, a 1996 Democratic primary for common pleas judge, Judge Adrine found that Janet Burney, an African–American, convincingly carried white suburban communities, while her white opponent, Mary Boyle, carried predominantly black suburbs. Pl.Ex. 37 at 8–9; Tr. at 116–19.

126. Nor does the Adrine Report indicate the party affiliations of the various candidates, a fact of considerable significance in determining whether legally significant racial bloc voting exists in heavily Democratic Cuyahoga County. Tr. at 1036, 1045–46, 1547.

127. Judge Adrine is not a statistician, Tr. at 83, 87, 92, or a political scientist. Tr. at 86–87. Judge Adrine indicated that he does not purport to have conducted a statistical analysis of racial bloc voting. Tr. at 92, 94–95. Judge Adrine acknowledged that he was not qualified to do a statistical analysis of racial bloc voting, Tr. at 112, and does not contend that his Report constitutes an accepted statistical methodology. Tr. at 121.

128. The Adrine Report states that black candidates have won twelve (12) of thirty (30) races for the common pleas bench in which an African–American candidate was involved. Pl.Ex. 37 at 8. The election results set forth in the Report, however, indicate that African–American

candidates won thirteen (13) of the thirty (30) races listed between 1974–96, or 43.3%. Pl.Ex. 37 at 1–7; Tr. at 103–05. Furthermore, although the Adrine Report lists the races involving Judge Frederick M. Coleman, an African–American judicial candidate, in 1978, in which he was successful, Pl.Ex. 37 at 2, and in 1986, in which he was unsuccessful, Pl.Ex. 37 at 3, it does not list Judge Coleman's successful 1980 race. Tr. at 189–90. Including this race increases the "win rate" for African–American candidates for the Court of Common Pleas for Cuyahoga County to 45.2%.

129. The Adrine Report assumes, without providing any basis in fact to support its assumption, that the African American candidate is the candidate preferred by a majority of black voters. Tr. at 114. Dr. King's report, however, establishes that on at least three occasions, a black Republican judicial candidate was not preferred by a majority of African–American voters. James C. Young, a black Republican, received only 46% of the black vote when he was defeated by Judge Carolyn Friedland for a seat on the common pleas bench in 1988; James E. Carson, a black Republican, received only 49% of the black vote when he was defeated by Judge Donald C. Nugent for a seat on the common pleas bench in 1990, and only 41% of the black vote when he was defeated by Judge Ann Dyke for a seat on the court of appeals in 1992. Def.Ex. A, Table 3 at 2; Tr. at 1395–97, 1545.

130. Despite the acknowledged shortcomings of his Report, Judge Adrine reached several conclusions with which most of the witnesses agreed. Judge Adrine concluded that "[i]t would be inaccurate and demagogic to conclude that race is the only factor which decides the outcome of a contest for the Common Pleas Court of Cuyahoga County." Pl.Ex. 37 at 10; Tr. at 136. Drs. Asher and Tuchfarber agree with this conclusion. Tr. at 1049, 1581–82.

131. Judge Adrine also concluded that "[m]any factors effect the outcome of any campaign for public office." Pl.Ex. 37 at 10, Tr. at 136. Drs. Asher, King, and Tuchfarber agree with this conclusion. Tr. at 1049, 1471, 1582.

132. Like the Adrine Report, Dr. King's report establishes that African–American judicial candidates in Cuyahoga County can and do win judicial elections. Judge Stephanie Tubbs Jones, a black Democrat who has since been elected county-wide as the Cuyahoga County Prosecuting Attorney, Tr. at 412, was elected to the common pleas bench in 1988 with 44% of the white vote. Def.Ex. A, Table 3 at 1. Judge Leodis Harris, a black Democrat, was elected to the Court of Common Pleas, Juvenile Division, with 49% of the white vote. Def.Ex. A, Table 3 at 1; Tr. at 426. Judge Lillian J. Greene, a black Democrat, was elected to the common pleas bench in 1986 with 47% of the white vote, and again in 1992 with 61% of the white vote. Def.Ex. A, Table 3 at 1; Tr. at 1227, 1394. Judge Patricia Ann Blackmon was elected to the Court of Appeals for Cuyahoga County, Eighth Appellate District, in 1990 with 50% of the white vote. Def.Ex. A, Table 3 at 1; Tr. at 426, 1393–94.

134. Dr. King determined that the "average degree of racial bloc voting," see Findings of Fact at ¶ 79, in Cuyahoga County judicial elections was 13, i.e., that on average 13% more African–American voters vote for Democratic judicial candidates than do white voters. Def.Ex. A at Table 4.

135. Dr. King determined that Democratic candidates win 72% of the judicial elections in the challenged courts in Cuyahoga County. Def.Ex. A, Table 4, Tr. at 1400–01. Dr. King also determined that African–American judicial candidates, whether or not they are the candidates preferred by African–American voters, win 31% of the general elections involving at least one African–American judicial candidate, and that the candidate preferred by

African–American voters win 71% of the judicial elections for the challenged courts in Cuyahoga County. Def.Ex. A, Table 4; Tr. at 1401–02.

### Cuyahoga County–Totality of Circumstances

136. Plaintiffs' witness Judge Adrine testified that he was unaware of any voting related discrimination in Cuyahoga County. Tr. at 121–22. As previously noted, the Plaintiffs have not asserted that there is any recent history of voting-related discrimination in Ohio. Def.Ex. 22 at 3–4, No. 5. Drs. Tuchfarber and Asher testified that there was, in fact, no such recent history of voting-related discrimination. Def.Ex. B at 10; Def.Ex. C at 11; Tr. at 1013, 1568–69, 1606–07. The Court hereby makes this same finding with respect to Cuyahoga County in general, and with respect to the Court of Appeals for Cuyahoga County, Eighth Appellate District, the Court of Common Pleas for Cuyahoga County, and the Bedford Municipal Court in particular.

137. The only voting practice or procedure which Plaintiffs assert enhances the opportunity for discrimination against African–Americans is the use of at-large judicial election districts linked to the territorial jurisdictions of the Court of Appeals for Cuyahoga County, Eighth Appellate District, the Court of Common Pleas for Cuyahoga County, and the Bedford Municipal Court. Def.Ex. 22 at 4–5, No. 7; Def.Ex. B at 10.

138. There is no evidence that minorities have been excluded from the candidate slating processes of the major political parties in Cuyahoga County. Def.Ex. B at 11; Tr. at 122–23. Plaintiffs' witnesses Judge Adrine, State Senator Jeffrey Johnson, and former Cleveland City Council President and Co–Chairman of the Cuyahoga County Democratic Party George Forbes all testified that African–Americans have served on the Cuyahoga County Democratic Party screening committee and that there are no barriers to African–Americans in the county Democratic party screening and nomination processes. Tr. at 122–23, 369, 390–91, 397–98, 401–02, 407, 485–88, 510–13. Defendants' witness Robert T. Bennett, Chairman of the Ohio Republican Party and the former Executive Vice–Chairman of the Cuyahoga County Republican Party, Tr. at 1203, 1210, testified that African–Americans have served on the Cuyahoga County Republican Party and that no such barriers exist in the county Republican party screening and nomination processes. Tr. at 1209, 1212, 1241–42.

139. Indeed, both political parties in Cuyahoga County have actively recruited African–American judicial candidates. Def.Ex. B at 11; Tr. at 369, 399, 404, 1211–12.

140. The Court has previously found that African–Americans in Ohio have suffered discrimination in the areas of education, employment, and health. Nor is there any serious dispute that there remain disparities among whites and African–Americans in several socio-economic categories as a result of such discrimination. The Court has also found, however, that Plaintiffs have failed to establish that the effects of past discrimination deny African–Americans equal access to the political process or actually hamper the ability of African–Americans to participate in the political process. The Court hereby makes these same findings with respect to Cuyahoga County in general, and with respect to the Court of Appeals for Cuyahoga County, Eighth Appellate District, the Court of Common Pleas for Cuyahoga County, and the Bedford Municipal Court in particular.

141. The Court has previously found that, in general, judicial campaigns have not been marked by overt or subtle racial appeals. Plaintiffs have identified only two such instances in Cuyahoga County, both involving races for the Court of Common Pleas. Plaintiffs have identified no instances of overt or subtle racial appeals in campaigns for the Court of Appeals for

Cuyahoga County, Eighth Appellate District, or the Bedford Municipal Court.

142. The first instance of overt or subtle racial appeals identified by Plaintiffs involved Judge Lillian J. Greene's 1986 race against incumbent white Republican Common Pleas Judge Fred J. Guzzo. Judge Guzzo distributed campaign literature with an unflattering picture of Greene. Tr. at 62–63. Plaintiffs' and Defendants' witnesses testified that this subtle racial appeal backfired, Tr. at 113, 1293, and Greene defeated Judge Guzzo. Def. Ex. 15 at 16; Tr. at 113. Judge Greene easily won reelection to the common pleas bench in 1992. Def.Ex. 15 at 19; Tr. at 1236–37.

143. The second instance involved incumbent Common Pleas Judge Character's 1988 race against Patricia A. Cleary, a white Republican. Tr. at 156. In that race, the local newspaper published separate editions for the east side and the west side of Cuyahoga County. The edition circulated on the east side did not contain the candidates' pictures and headlined the story as "prosecutor v. judge," while the edition circulated on the west side contained the candidates' pictures and headlined the story as "black v. Irish, male v. female, and defense v. prosecution." Tr. at 156. Judge Character was defeated in that race, Def.Ex. 15 at 17; Tr. at 156–57, but was subsequently reappointed to the common pleas bench by the Governor and successfully retained his seat in the 1990 general election. Def .Ex. 15 at 18; Tr. at 177–78.

144. The Court finds that these two isolated instances do not alter the Court's general finding, and hereby finds that judicial elections in Cuyahoga County have not been marked by overt or subtle racial appeals.

145. There are 8,583 registered active attorneys in Cuyahoga County. Def.Ex. 10. Using the highest estimate provided by Plaintiffs' witnesses, there are approximately 500, or 5.8%, African–American attorneys in Cuyahoga County. Tr. at 70, 96. There is no evidence concerning the total number of attorneys or the number of African–American attorneys within the territorial jurisdiction of the Bedford Municipal Court.

146. There are currently 89 state court judges in Cuyahoga County, including 10, or 11.2%, African–American judges. Tr. at 430, 455–56, 1580–81, 1601–03. Currently, there is one African–American, Judge Patricia Ann Blackmon, serving on the Court of Appeals for Cuyahoga County, Eighth Appellate District, two African–Americans, Judges Lillian J. Greene and Shirley Strickland Saffold, serving on the Court of Common Pleas for Cuyahoga County, and no African–Americans serving on the Bedford Municipal Court. Def.Ex. 9; Tr. at 54–55, 150, 170, 327, 389, 491–92.

147. There were forty-five judicial primary races involving black candidates in Cuyahoga County between 1984 and 1996– thirty–three Democratic primary races and twelve Republican primary races. Black candidates won nineteen out of the thirty-three Democratic primary races and nine out of the twelve Republican primary races. Of these, seven of the Democratic races and seven of the Republican races were uncontested. Def.Ex. 15 at 7–15, 22; Tr. at 1550.

148. In general elections in Cuyahoga County between 1984 and 1996, there were thirty races involving black judicial candidates. Black candidates won ten out of the thirty races. Black Democrats won nine out of the ten races in which the black candidate was successful. A black Republican won one race. Of the twenty losses, black Democrats lost nine races and black Republicans lost nine races. One race involved a black candidate with unknown partisan affiliation. Def.Ex. 15 at 16–22; Tr. at 1551.

149. Where black candidates ran as Democrats in Cuyahoga County, they were generally successful, accounting for nine of the ten races in which black candidates were successful. Def.Ex. 15 at 16–22; Tr. at 1552. Of the twenty losses by black

candidates, black Republicans lost nine races. Def.Ex. 15 at 16–22; Tr. at 1552.

150. Black Democrats were elected to the Cuyahoga County Court of Common Pleas in 1984 (Judge Stephanie Tubbs Jones), 1986 (Judge Lillian J. Greene), 1988 (Judges Jones and Leodis Harris), 1990 (Judge Carl J. Character), 1992 (Judge Greene), and 1994 (Judge Shirley Strickland Saffold). Def.Ex. 15 at 16–20; Tr. at 1219, 1225–27, 1230–31, 1233, 1235–37, 1239. Based on the data available from 1985 through 1995, these successful black candidates received from 44% to 61% of the white vote and 53% to 67% of the total vote. Def.Ex. A, Table 3.

151. The lone successful African–American Republican was Judge Sara J. Harper, who won election to the Eighth District Court of Appeals in 1990, following unsuccessful races for a seat on that bench in 1986 and 1988. Tr. at 1234. Judge Harper also ran unsuccessfully for the Court of Common Pleas, Domestic Relations Division, in 1984 and thus accounted for three of the losses by black Republican candidates. Def.Ex. 15 at 16–17; Tr. at 1220, 1227, 1548.

152. Two black candidates have been elected to the Eighth District Court of Appeals. In addition to Judge Harper, Judge Patrician Ann Blackmon, a black Democrat, defeated Anthony O. Calabrese, Jr., a white Republican, in 1990. Def.Ex. 15 at 18; Tr. at 1233. Judge Blackmon received 50% of the white vote and 55% of the total vote. Def.Ex. A, Table 3; Tr. at 426, 1233–34. Judge Blackmon easily won reelection in 1996. Def.Ex. 15 at 21; Tr. at 1240.

153. The only black candidate to run for a seat on the Bedford Municipal Court from 1984 through 1996 was Warner Jackson, who ran as an independent in 1993 and was defeated. Def.Ex. 16 at 204.

154. The Court finds that justice in the Court of Appeals for Cuyahoga County, Eighth Appellate District, the Court of Common Pleas for Cuyahoga County, and the Bedford Municipal Court is not currently being administered in a racially discriminatory manner, and that the judges thereof are dispensing fair and impartial justice without regard to the race of the litigants. Neither Plaintiffs nor their witnesses have asserted otherwise.

### *Franklin County–Gingles Preconditions*

155. According to the 1990 Census, Franklin County, and, therefore, the electoral districts for the Court of Appeals for Franklin County, Tenth Appellate District, the Court of Common Pleas for Franklin County, and the Franklin County Municipal Court, have a total population of 961,437 and a black population of 152,840, or 15.90%. Def.Ex. 7 at 1, 2, 6; Def.Ex. 8.

156. The African–American population in Franklin County is primarily concentrated on the near east side of the City of Columbus. Tr. at 521–23.

157. Although the map of Franklin County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district, Defendants' experts acknowledged that African–Americans could probably constitute a majority in at least one geographically compact single-member district for the Franklin County Court of Common Pleas. Tr. at 1528. The Court notes that *mathematically,* there is sufficient African–American population in Franklin County to constitute a majority in a hypothetical, single-member district for the Court of Appeals for Franklin County, Tenth Appellate District, and Franklin County Municipal Court. Def.Ex. 7 at 1, 6; Tr. at 1622. Plaintiffs offered no evidence, however, that a *geographically compact* single-member district could be drawn for these courts.

158. Plaintiffs presented no evidence, statistically valid or otherwise, that African–Americans in Franklin County are politically cohesive or of legally significant white bloc voting in Franklin County. De-

fendants' expert testified that there is, in fact, no legally significant racial bloc voting in Franklin County. Tr. at 1000.

159. Dr. King's report establishes, however, that African–American judicial candidates in Franklin County can and do win judicial elections. Judge Janet E. Jackson, a black Democrat who has since been appointed as Columbus City Attorney, Tr. at 1016, was elected to the municipal bench in 1987 with 49% of the white vote, and was reelected to the municipal bench in 1993 with 66% of the white vote. Def.Ex. A, Table 3; Tr. at 995. In a 1992 race for the Court of Common Pleas, Domestic Relations/Juvenile Division, Judge Yvette M. McGee, nka McGee–Brown, a black Democrat, defeated Judge Clifford Cloud, a white, incumbent Republican, and received 46% of the white vote. Def.Ex. A, Table 3 at 1; Tr. at 994, 1170–71. Judge James A. Pearson, a black Republican, ran unopposed for, and was elected to, the municipal bench in 1987. Def.Ex. A at Table 3; Tr. at 988. Judge Guy Reece, a black Republican, was elected to the municipal bench in 1989 with only 30% of the black vote, but with 68% of the white vote. Def.Ex. A, Table 3; Tr. at 992–93. Judge Reece was elected to the common pleas bench in 1992 with 58% of the black vote and 57% of the white vote. Def.Ex. A, Table 3; Tr. at 993–94. Judge Dwayne Maynard, a black Republican was elected to the municipal bench in 1993 with only 32% of the black vote, but with 62% of the white vote. Def.Ex. A, Table 3; Tr. at 995, 1175–76. And Judge James E. Green, a black Republican, was elected to the municipal bench with 65% of the white vote. Def.Ex. A, Table 3; Tr. at 996–97, 1179–80.

160. Dr. King determined that the "average degree of racial bloc voting" in Franklin County judicial elections was 36, *i.e.*, that on average 36% more African–American voters vote for Democratic judicial candidates than do white voters. Def. Ex. A at Table 4. This number is the highest "average degree of racial bloc vot-

ing" for any of counties at issue herein, but is not surprising given that most African–Americans identify themselves as Democrats and that Franklin is a heavily Republican county. Def.Ex. A at 17; Tr. at 1043. This "average degree of racial bloc voting" does not begin to approach the 70–plus percent degree of racial bloc voting discussed by Judge Boggs in *Clarke v. City of Cincinnati*, 40 F.3d at 816 (Boggs, J., concurring), as being typical of *legally significant racial bloc voting*.

161. Dr. King determined that Democratic candidates win only 27% of the judicial elections in the challenged courts in Franklin County. Def.Ex. A, Table 4. Dr. Asher noted that African–American Democratic judicial candidates are at least marginally more successful than white Democratic judicial candidates in Franklin County. Def.Ex. C at 10; Tr. at 999. Dr. King also determined that African–American judicial candidates, whether or not they are the candidates preferred by African–American voters, win 54% of the general elections involving at least one African–American judicial candidate, and that the candidate preferred by African–American voters win 30% of the judicial elections for the challenged courts in Franklin County. Def.Ex. A, Table 4.

### *Franklin County–Totality of Circumstances*

162. As previously noted, the Plaintiffs have not asserted that there is any recent history of voting-related discrimination in Ohio. Def.Ex. 22 at 3–4, No. 5. Drs. Tuchfarber and Asher testified that there was, in fact, no such recent history of voting-related discrimination. Def.Ex. B at 10; Def.Ex. C at 11; Tr. at 1013, 1568–69, 1606–07. The Court hereby makes this same finding with respect to Franklin County in general, and with respect to the Court of Appeals for Franklin County, Tenth Appellate District, the Court of Common Pleas for Franklin County, and the Franklin County Municipal Court in particular.

163. The only voting practice or procedure which Plaintiffs assert enhances the opportunity for discrimination against African-Americans is the use of at-large judicial election districts linked to the territorial jurisdictions of the Court of Appeals for Franklin County, Tenth Appellate District, the Court of Common Pleas for Franklin County, and the Franklin County Municipal Court. Def.Ex. 22 at 4–5, No. 7; Def.Ex. B at 10.

164. There is no evidence that minorities have been excluded from the candidate slating processes of the major political parties in Franklin County. Def.Ex. C at 11. Terry L. Casey, former Executive Director of the Franklin County Republican Party, Tr. at 1152–53, testified that there are no barriers to African-Americans in the county Republican party screening and nomination processes, and that African-Americans have routinely served as Republican Party officers and on the various screening committees of the party. Tr. at 1176–77, 1181, 1190.

165. Indeed, both political parties in Franklin County have actively recruited African-American judicial candidates. Def.Ex. C at 11; Tr. at 997–98, 1001, 1158.

166. The Court has previously found that African-Americans in Ohio have suffered discrimination in the areas of education, employment, and health. Nor is there any serious dispute that there remain disparities among whites and African-Americans in several socio-economic categories as a result of such discrimination. The Court has also found, however, that Plaintiffs have failed to establish that the effects of past discrimination deny African-Americans equal access to the political process or actually hamper the ability of African-Americans to participate in the political process. The Court hereby makes these same findings with respect to Franklin County in general, and with respect to the Court of Appeals for Franklin County, Tenth Appellate District, the Court of Common Pleas for Franklin County, and the Franklin County Municipal Court in particular.

167. The Court has previously found that, in general, judicial campaigns have not been marked by overt or subtle racial appeals. Plaintiffs have identified no instances of overt or subtle racial appeals in Franklin County for any of the challenged courts. Accordingly, the Court hereby specifically finds that campaigns for the Court of Appeals for Franklin County, Tenth Appellate District, the Court of Common Pleas for Franklin County, and the Franklin County Municipal Court have not been marked by overt or subtle racial appeals.

168. There are 6,194 registered active attorneys in Franklin County. Def.Ex. 10. The only estimate provided during trial for the number of African-American attorneys in Franklin County was the number of attorneys listed in the *1995–1996 Ohio Attorneys of Color Directory* prepared by Plaintiffs' witness, Judge Adrine. Def .Ex. 10. Although that directory is most likely incomplete. Tr. at 67–68, 70, it is currently the best resource available for this information. Tr. at 128. According to this list prepared by Judge Adrine, there are approximately 88, or 1.4%, African-American attorneys in Franklin County. Def. Ex. 10.

169. There are currently 44 state court judges in Franklin County, including 3, or 6.8%, African-American judges. Currently, there are no African-Americans serving on the Court of Appeals for Franklin County, Tenth Appellate District, one African-American, Judge Yvette McGee-Brown, serving on the Court of Common Pleas for Franklin County, Domestic Relations/Juvenile Division, and two African-Americans, Judges James E. Green and W. Dwayne Maynard, serving on the Franklin County Municipal Court. Def. Ex. 9; Tr. At 56, 150.

170. There were six judicial primary races involving black candidates in Franklin County between 1979 and 1996. All six black judicial candidates ran unopposed in

these primary elections. Two of these candidates were black Republicans and four were black Democrats. Def.Ex. 15 at 1–6; Tr. at 998.

171. In general elections in Franklin County between 1977 and 1996, black candidates ran in eighteen judicial races. Black candidates won eleven out of the eighteen races. Two of the races were contests between black candidates. Four of the eleven successful black candidates ran unopposed. Of the eleven successful black candidates, eight were Republicans and three were Democrats. Def.Ex. 15 at 1–6; Tr. at 998–99.

172. Of the seven unsuccessful black candidates, one was a Republican and six were Democrats. The sole black Republican loss was the 1982 race for the Court of Common Pleas which pitted Municipal Judge Dale A. Crawford, a white Democrat who has since become a Republican, Tr. at 986, against Municipal Judge James A. Pearson, a black Republican. Tr. at 1161–62. Judge Pearson's narrow loss, 354 votes, was most likely due to some unfavorable publicity he received just prior to the election in a high-profile case pending before him in Franklin County Municipal Court. Tr. at 986, 1162. Judge Pearson has been successful in judicial elections in Franklin County both prior to and subsequent to the 1982 race against Judge Crawford. Def.Ex. 15 at 1–5; Tr. at 986, 988, 1160, 1163.

173. Where African–Americans ran as Republicans in Franklin County, they were successful in eight out of nine races. Of the seven unsuccessful black candidates, six were Democrats. Thus, where African–Americans candidates ran as a member of the majority party in Franklin County, African–American candidates were generally successful. Def.Ex. A at 17; Def.Ex. C at 10; Tr. at 993, 999.

174. Black Republicans were successful in races for the Franklin County Municipal Court in 1977 (Judge H. Alfred Glascor), 1981 (Judge James A. Pearson), 1983 (Judge Glascor), 1987 (Judge Pearson), 1989 (Judge Guy Reece), 1993 (Judge W. Dwayne Maynard), and 1995 (Judge James E. Green). Def.Ex. 15 at 3–5; Tr. at 985–88, 992–93, 1159–60, 1175–76, 1179–80.

175. In 1987, Judge Janet E. Jackson, an African–American Democrat running as an appointed incumbent, defeated Edward Morgan, a white Republican. Tr. at 1164–65. In that race, Judge Jackson received 49% of the white vote and 55% of the two-party vote. In 1993, Judge Jackson defeated John Leibold, a white Republican, receiving 66% of the white vote and 69% of the two-party vote. Def.Ex. A, Table 3; Tr. at 995, 1177–78.

176. In 1986 and 1988 races for the common pleas bench, black Democrats lost to white Republicans running in the heavily Republican county district. However, in 1992, Guy Reece, a black Republican, defeated Terry L. Tataru, a white Democrat. Tr. at 1169–70. Judge Reece received 58% of the black vote, 57% of the white vote and 57% of the overall vote. Def.Ex. A, Table 3; Def.Ex. 15 at 5; Tr. at 993–94, 1170.

177. Also in 1992, Judge Yvette McGee, nka Yvette McGee Brown, a black Democrat, defeated Judge Clifford Cloud, a white Republican incumbent, for a seat on the Court of Common Pleas, Domestic Relations/Juvenile Division. Tr. at 1170–71. Judge McGee Brown won 52% of the total vote and 46% of the white vote. Def. Ex. A, Table 3; Def.Ex. 15 at 5; Tr. at 994–95.

178. There were no African–American candidates for the Court of Appeals for Franklin County, Tenth Appellate District, from 1979 through the present. Def.Ex. 15 at 1–6.

179. The Court finds that justice in the Court of Appeals for Franklin County, Tenth Appellate District, the Court of Common Pleas for Franklin County, and the Franklin County Municipal Court is not currently being administered in a racially discriminatory manner, and that the

judges thereof are dispensing fair and impartial justice without regard to the race of the litigants. Neither Plaintiffs nor their witnesses have asserted otherwise.

### Hamilton County—Gingles Preconditions

180. According to the 1990 Census, Hamilton County, and, therefore, the electoral districts for the Court of Appeals for Hamilton County, First Appellate District, and the Court of Common Pleas for Hamilton County, have a total population of 866,228 and a black population of 181,145, or 20.91%. Def.Ex. 7 at 1, 3; Def.Ex. 8.

181. The African–American population in Hamilton County is primarily concentrated in the central and western portion of the City of Cincinnati, and in the suburban communities of Forest Park, Lincoln Heights, and Woodlawn. Tr. at 220–22, 775–76.

182. Although the map of Hamilton County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district, Defendants' experts acknowledged that African–Americans could probably constitute a majority in at least one geographically compact single-member district for the Hamilton County Court of Common Pleas. Tr. at 1626. The Court notes that *mathematically,* there is sufficient African–American population in Hamilton County to constitute a majority in a hypothetical, single-member district for both the Court of Appeals for Hamilton County, First Appellate District, and the Court of Common Pleas for Hamilton County. Def.Ex. 7 at 1; Tr. at 255. Plaintiffs offered no evidence, however, that a *geographically compact* single-member district could be drawn for these courts. The Court notes, however, that pursuant to the district court's order in *Mallory v. Eyrich,* 717 F.Supp. 540 (S.D.Ohio 1989), the fourteen-member Hamilton County Municipal Court has been divided into seven subdistricts,

two of which contain a majority of African–American population. Tr. at 207–09, 1626.

183. Plaintiffs presented no evidence, statistically valid or otherwise, that African–Americans in Hamilton County are politically cohesive or of legally significant white bloc voting in Hamilton County.

184. Dr. King's report establishes, however, that African–American judicial candidates in Hamilton County can and do win judicial elections. Judge Deborah K. Gaines, a black Democrat, was elected to the Court of Common Pleas, Domestic Relations Division, without opposition in 1990 and 1992. Def.Ex. A, Table 3; Tr. at 1563. In elections between 1985 and 1995, Judge Nadine Allen, a black Democrat, was elected to the municipal bench in 1987 and reelected in 1989. Def.Ex. 15 at 27; Tr. at 233–34, 852–53. Judge Melba Marsh, a black Republican, was elected to the municipal bench in 1989. Def.Ex. 15 at 27; Tr. at 235, 852. Judge Allen in 1987 and 1989, and Judge Marsh in 1989, defeated white opponents, and received white crossover votes. Def.Ex. 15 at 27; Tr. at 233–35. Dr. King did not analyze the elections for the Hamilton County Municipal Court because that is not one of the courts challenged by the Plaintiffs herein.

185. Dr. King determined that the "average degree of racial bloc voting" in Hamilton County judicial elections was 30, **i.e.,** that on average 30% more African–American voters vote for Democratic judicial candidates than do white voters. Def.Ex. A at Table 4. This number is not surprising given that most African–Americans identify themselves as Democrats and that Hamilton is a heavily Republican county. Def.Ex. A at 17. This "average degree of racial bloc voting" does not begin to approach the 70–plus percent degree of racial bloc voting discussed by Judge Boggs in *Clarke v. City of Cincinnati,* 40 F.3d at 816 (Boggs, J., concurring), as being typical of legally significant racial bloc voting.

186. Dr. King determined that Democratic candidates win only 13% of the judicial elections in the challenged courts in

Hamilton County. Def.Ex. A, Table 4. Dr. King also determined that African–American judicial candidates, whether or not they are the candidates preferred by African–American voters, won no contested elections *for the challenged courts* during the relevant time period. Def.Ex. A, Table 4. As previously noted, however, African–American candidates did win elections against white opponents for the Hamilton County Municipal Court, which is not at issue herein, during this time period. Dr. King also found that the candidate preferred by African–American voters won 13% of the judicial elections *for the challenged courts* in Hamilton County. Def. Ex. A, Table 4.

### Hamilton County—Totality of Circumstances

187. As previously noted, the Plaintiffs have not asserted that there is any recent history of voting-related discrimination in Ohio. Def.Ex. 22 at 3–4, No. 5. Drs. Tuchfarber and Asher testified that there was, in fact, no such recent history of voting-related discrimination. Def.Ex. B at 10; Def.Ex. C at 11; Tr. at 1013, 1568–69, 1606–07. The Court hereby makes this same finding with respect to Hamilton County in general, and with respect to the Court of Appeals for Hamilton County, First Appellate District, and the Court of Common Pleas for Hamilton County in particular.

188. The only voting practice or procedure which Plaintiffs assert enhances the opportunity for discrimination against African–Americans is the use of at-large judicial election districts linked to the territorial jurisdictions of the Court of Appeals for Hamilton County, First Appellate District, and the Court of Common Pleas for Hamilton County. Def.Ex. 22 at 4–5, No. 7; Def.Ex. B at 10.

189. There is no evidence that minorities have been excluded from the candidate slating processes of the major political parties in Hamilton County. Def.Ex. B at 11. There is no evidence that barriers exist to African–Americans in the county Democratic or Republican parties screening and nomination processes, and indeed, there are African–Americans represented in the party structure of both parties in Hamilton County. Tr. at 1557.

190. Indeed, both political parties in Hamilton County have actively recruited African–American judicial candidates. Def.Ex. B at 11; Tr. at 1570.

191. The Court has previously found that African–Americans in Ohio have suffered discrimination in the areas of education, employment, and health. Nor is there any serious dispute that there remain disparities among whites and African–Americans in several socio-economic categories as a result of such discrimination. The Court has also found, however, that Plaintiffs have failed to establish that the effects of past discrimination deny African–Americans equal access to the political process or actually hamper the ability of African–Americans to participate in the political process. The Court hereby makes these same findings with respect to Hamilton County in general, and with respect to the Court of Appeals for Hamilton County, First Appellate District, and the Court of Common Pleas for Hamilton County in particular.

192. The Court has previously found that, in general, judicial campaigns have not been marked by overt or subtle racial appeals. Plaintiffs have identified no instances of overt or subtle racial appeals in Hamilton County for either of the challenged courts. Judge Bunyan testified that although he believed that he was defeated in three separate county-wide judicial elections because he was African–American, he was not aware that his opponents in those elections ever used race against him. Tr. at 829. In what he believes was a racial appeal, Plaintiff Mallory testified that, in races for the municipal bench, Judge Nadine Allen's and Judge Melba Marsh's opponents used pictures of the candidates in television ads. Tr. at

242. Mallory further testified, however, that these "racial appeals" infuriated white and black voters alike and that both Allen and Marsh won. Tr. at 243. Accordingly, the Court hereby specifically finds that campaigns for the Court of Appeals for Hamilton County, First Appellate District, and the Court of Common Pleas for Hamilton County have not been marked by overt or subtle racial appeals.

193. There are 4,004 registered active attorneys in Hamilton County. Def.Ex. 10. Using the highest estimate provided by Plaintiffs' witnesses, there are approximately 150, or 3.7%, African–American attorneys in Hamilton County. Tr. at 834–35.

194. There are currently 42 state court judges in Hamilton County, including 6, or 14.3%, African–American judges. Tr. at 1645. Currently, there are no African–Americans serving on the Court of Appeals for Hamilton County, First Appellate District, and two African–Americans, Judge Melba Marsh on the General Division and Judge Deborah K. Gaines on the Domestic Relations Division, serving on the Court of Common Pleas for Hamilton County. Def. Ex. 9; Tr. at 56, 150, 1645–46. In addition there are four African–Americans, Judges Nadine L. Allen, Kim W. Burke, William L. Mallory, Jr., and John Andrew West, serving on the Hamilton County Municipal Court. Def.Ex. 9; Tr. at 1646.

195. There were eight judicial primary races involving black candidates in Hamilton County between 1976 and 1996. African–American candidates won seven of these eight primary races. Seven out of the eight primary races were Democratic primaries. In six of the eight races, black candidates ran unopposed. In the two contested races, one black Republican won and one black Democrat lost. Def.Ex. 15 at 23–24, 29; Tr. at 1564.

196. In general elections between 1976 and 1996, excluding Hamilton County Municipal Court elections beginning in 1993, African–American candidates ran in eighteen races. African–American candidates won eight out of the eighteen races. Five of these races were uncontested. The three contested races were won by two black Democrats and one black Republican. Of the eight races won by a black candidate, black Republicans won three races and black Democrats won five races. In the ten races in which the black candidate was unsuccessful, one black Republican lost and nine black Democrats lost. One additional black Republican also lost in a five seat race. Def.Ex. 15 at 25–29; Tr. at 1564–65.

197. In 1983, Barry Isaacs, a black Republican, and Jack Sherman, Jr., a black Democrat, both ran unopposed for seats on the Hamilton County Municipal Court. Def.Ex. 15 at 26; Tr. at 1558–59.

198. In 1989, Judge Nadine L. Allen, a black Democrat, defeated Timothy S. Black, a white Republican, and Judge Melba Marsh, a black Republican, defeated Carol N. McIlwain, a white Democrat, for seats on the municipal bench. Def.Ex. 15 at 27; Tr. at 233–35, 851–52, 1561–62. Judge Marsh was elected to the Hamilton County Common Pleas bench in 1996. Def.Ex. 15 at 28; Tr. at 853, 1564. In 1990 and 1992, Judge Deborah K. Gaines, a black Democrat, ran unopposed for the Hamilton County Court of Common Pleas, Domestic Relations Division. Def.Ex. 15 at 25; Tr. at 1563.

199. Since 1976, only one African–American, Caleb Brown, Jr., has run for a seat on the Court of Appeals for Hamilton County, First Appellate District. In 1994, Brown, a Democrat, lost to Judge Mark Painter, a Republican. Def.Ex. 15 at 28.

200. The Court finds that justice in the Court of Appeals for Hamilton County, First Appellate District, and the Court of Common Pleas for Hamilton County is not currently being administered in a racially discriminatory manner, and that the judges thereof are dispensing fair and impartial justice without regard to the race of the litigants. Neither Plaintiffs nor their witnesses have asserted otherwise.

### Lucas County—Gingles Preconditions

201. According to the 1990 Census, Lucas County, and, therefore, the electoral district for the Court of Common Pleas for Lucas County, have a total population of 462,361 and a black population of 68,456, or 14.81%. Def.Ex. 7 at 3; Def.Ex. 8.

202. Plaintiffs provided no testimony with regard to the concentration of the African–American population in Lucas County.

203. The map of Lucas County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district, and Defendants' experts were unable to conclude from the information presented whether African–Americans could constitute a majority in at least one geographically compact single-member district for the Lucas County Court of Common Pleas. Tr. at 1530. The Court notes that *mathematically,* there is sufficient African–American population in Lucas County to constitute a majority in a hypothetical, single-member district for the Lucas County Court of Common Pleas. Def.Ex. 7 at 3. Plaintiffs offered no evidence, however, that a geographically compact single-member district could be drawn for this court.

204. According to the 1990 Census, the electoral district for the Toledo Municipal Court, see Findings of Fact at ¶ 32, has a total population of 341,289 and a black population of 65,670, or 19.24%. Def.Ex. 7 at 6; Def.Ex. 8.

205. Plaintiffs provided no testimony with regard to the concentration of the African–American population within the territorial jurisdiction of the Toledo Municipal Court.

206. The map of Lucas County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district for the Toledo Municipal Court. See Findings of Fact at ¶ 6. The Court notes that *mathe-matically,* there is sufficient African–American population within the territorial jurisdiction of the Toledo Municipal Court to constitute a majority in a hypothetical, single-member district for that court. Def.Ex. 7 at 6. Plaintiffs offered no evidence, however, that a *geographically compact* single-member district could be drawn for the Toledo Municipal Court.

207. Plaintiffs presented no evidence, statistically valid or otherwise, that African–Americans in Lucas County are politically cohesive or of legally significant white bloc voting in Lucas County. Tr. at 1004.

208. Dr. King's report establishes, however, that African–American judicial candidates in Lucas County can and do win judicial elections. Judge Charles J. Doneghy, a black Democrat, was elected to the common pleas bench without opposition in 1988 and 1994. Def.Ex. A, Table 3; Tr. at 1002. Judge Robert Penn, a black Democrat, was elected to the municipal bench without opposition in 1985 and 1989. Def.Ex. A, Table 3; Def.Ex. 15 at 38–39.

209. Dr. King determined that the "average degree of racial bloc voting" in Lucas County judicial elections was 30, **i.e.,** that on average, 30% more African–American voters vote for Democratic judicial candidates than do white voters. Def.Ex. A at Table 4. This "average degree of racial bloc voting" does not begin to approach the 70–plus percent degree of racial bloc voting discussed by Judge Boggs in *Clarke v. City of Cincinnati,* 40 F.3d at 816 (Boggs, J., concurring), as being typical of *legally significant racial bloc voting.*

210. Dr. King determined that Democratic candidates win 47% of the judicial elections in the challenged courts in Lucas County. Def .Ex. A, Table 4. Dr. King also determined that African–American judicial candidates, whether or not they are the candidates preferred by African–American voters, won no contested elections for the challenged courts during the relevant time period, and that the candidate preferred by African–American vot-

ers won 47% of the judicial elections for the challenged courts in Lucas County. Def.Ex. A, Table 4.

### Lucas County—Totality of Circumstances

211. As previously noted, the Plaintiffs have not asserted that there is any recent history of voting-related discrimination in Ohio. Def.Ex. 22 at 3–4, No. 5. Drs. Tuchfarber and Asher testified that there was, in fact, no such recent history of voting-related discrimination. Def.Ex. B at 10; Def.Ex. C at 11; Tr. at 1013, 1568–69, 1606–07. The Court hereby makes this same finding with respect to Lucas County in general, and with respect to the Court of Common Pleas for Lucas County and the Toledo Municipal Court in particular.

212. The only voting practice or procedure which Plaintiffs assert enhances the opportunity for discrimination against African–Americans is the use of at-large judicial election districts linked to the territorial jurisdictions of the Court of Common Pleas for Lucas County and the Toledo Municipal Court. Def.Ex. 22 at 4–5, No. 7; Def.Ex. B at 10.

213. There is no evidence that minorities have been excluded from the candidate slating processes of the major political parties in Lucas County. Def.Ex. B at 11.

214. The Court has previously found that African–Americans in Ohio have suffered discrimination in the areas of education, employment, and health. Nor is there any serious dispute that there remain disparities among whites and African–Americans in several socio-economic categories as a result of such discrimination. The Court has also found, however, that Plaintiffs have failed to establish that the effects of past discrimination deny African–Americans equal access to the political process or actually hamper the ability of African–Americans to participate in the political process. The Court hereby makes these same findings with respect to Lucas County in general, and with respect to the Court of Common Pleas for Lucas

County and the Toledo Municipal Court in particular.

215. The Court has previously found that, in general, judicial campaigns have not been marked by overt or subtle racial appeals. Plaintiffs have identified no instances of overt or subtle racial appeals in Lucas County for any of the challenged courts. Accordingly, the Court hereby specifically finds that campaigns for the Court of Common Pleas for Lucas County, and the Toledo Municipal Court have not been marked by overt or subtle racial appeals.

216. There are 1,798 registered active attorneys in Lucas County. Def.Ex. 10. The only estimate provided during trial for the number of African–American attorneys in Lucas County was the number of attorneys listed in the *1995–1996 Ohio Attorneys of Color Directory* prepared by Plaintiffs' witness, Judge Adrine. Def.Ex. 10. Although that directory is most likely incomplete. Tr. at 67–68, 70, it is currently the best resource available for this information. Tr. at 128. According to this list prepared by Judge Adrine, there are approximately 26, or 1.4%, African–American attorneys in Lucas County. Def.Ex. 10. There is no evidence concerning the total number of attorneys or the number of African–American attorneys within the territorial jurisdiction of the Toledo Municipal Court.

217. There are currently 30 state court judges in Lucas County, including 1, or 3.3%, African–American judge. Currently, there is one African–American, Judge Charles J. Doneghy, serving on the Court of Common Pleas for Lucas County, and no African–Americans serving on the Toledo Municipal Court. Def.Ex. 9.

218. There were five judicial primary races involving black candidates in Lucas County between 1976 and 1996. All five races were Democratic primaries involving an unopposed black candidate. Def.Ex. 15 at 37–40; Tr. at 1003.

219. African–American candidates ran in ten judicial elections in Lucas County between 1975 and 1996 All ten were black Democrats. The black candidates won eight of the ten judicial races. In seven of these races, black candidates were unopposed. In the three contested races, one black Democrat won and one black candidate, Joyce Woods, lost twice. Def.Ex. 15 at 37–40; Tr. At 1003–04.

220. With regard to the Toledo Municipal Court, black candidates ran in five races since 1977, winning four of the five races. Three of these African–American candidates ran unopposed. Def.Ex. 15 at 37–40.

221. With regard to the Lucas County Court of Common Pleas, there were five races involving black candidates since 1977. Black candidates won four out of the five races, with four of the black candidates running unopposed. In the single loss, Joyce H. Woods, a black Democrat, lost to Judge Robert Christiansen, a white Republican running as an incumbent. Woods received 41% of the white vote and 48% of the total vote. Def.Ex. A, Table 3; Def.Ex. 15 at 37–40; Tr. at 1002–03.

222. The Court finds that justice in the Court of Common Pleas for Lucas County, and the Toledo Municipal Court is not currently being administered in a racially discriminatory manner, and that the judges thereof are dispensing fair and impartial justice without regard to the race of the litigants. Neither Plaintiffs nor their witnesses have asserted otherwise.

### Mahoning County–Gingles Preconditions

223. According to the 1990 Census, Mahoning County, and, therefore, the electoral district for the Court of Common Pleas for Mahoning County, have a total population of 264,806 and a black population of 39,681, or 14.98%. Def.Ex. 7 at 4; Def.Ex. 8.

224. The African–American population in Mahoning County is primarily concentrated in the center city area of the City of Youngstown and along the Mahoning River. Tr. at 265–66, 556–58. There are also pockets of African–American population in the suburban communities of Campbell, Struthers, and Hubbard. Tr. at 266, 558.

225. The map of Mahoning County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district, and Defendants' experts were unable to conclude from the information presented whether African–Americans could constitute a majority in at least one geographically compact single-member district for the Mahoning County Court of Common Pleas. Tr. at 1531. The Court notes that *mathematically,* there is sufficient African–American population in Mahoning County to constitute a majority in a hypothetical, single-member district for the Mahoning County Court of Common Pleas. Def.Ex. 7 at 4. Plaintiffs offered no evidence, however, that a *geographically compact* single-member district could be drawn for this court.

226. According to the 1990 Census, the City of Youngstown, and, therefore, the electoral district for the Youngstown Municipal Court has a total population of 95,-732 and a black population of 36,487, or 38.11% Def.Ex. 7 at 7; Def.Ex. 8.

227. The map of Mahoning County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district for the Youngstown Municipal Court. The Court notes that *mathematically,* there is sufficient African–American population within the City of Youngstown to constitute a majority in a hypothetical, single-member district for the Youngstown Municipal Court. Def.Ex. 7 at 7. Plaintiffs offered no evidence, however, that a *geographically compact* single-member district could be drawn for the Youngstown Municipal Court.

228. Plaintiffs presented no evidence, statistically valid or otherwise, that African–Americans in Mahoning County are politically cohesive or of legally significant white bloc voting in Mahoning County.

229. Dr. King's report indicates that there were no two-candidate judicial elections involving African–American candidates from 1985 through 1995. Def.Ex. A, Table 3, Table 4. This is most likely due to the extremely small pool of African–Americans qualified to run for and hold judicial office in Mahoning County.

230. Dr. King determined that the "average degree of racial bloc voting" in Mahoning County judicial elections was 10, *i.e.*, that on average 10% more African–American voters vote for Democratic judicial candidates than do white voters. Def. Ex. A at Table 4.

231. Dr. King determined that Democratic candidates win 67% of the judicial elections in the challenged courts in Mahoning County. Def.Ex. A, Table 4. Dr. King also determined that the candidate preferred by African–American voters won 50% of the judicial elections for the challenged courts in Mahoning County. Def. Ex. A, Table 4.

### Mahoning County–Totality of Circumstances

232. As previously noted, with the exception of the *Armour* case, Plaintiffs have not asserted that there is any recent history of voting-related discrimination in Ohio. Def.Ex. 22 at 3–4, No. 5. Drs. Tuchfarber and Asher testified that there was, in fact, no such recent history of voting-related discrimination. Def.Ex. B at 10; Def.Ex. C at 11; Tr. at 1013, 1568–69, 1606–07. The Court hereby makes this same finding with respect to Mahoning County in general, and with respect to the Court of Common Pleas for Mahoning County and the Youngstown Municipal Court in particular.

233. The only voting practice or procedure which Plaintiffs assert enhances the opportunity for discrimination against African–Americans is the use of at-large judicial election districts linked to the territorial jurisdictions of the Court of Common Pleas for Mahoning County and the Youngstown Municipal Court. Def.Ex. 22 at 4–5, No. 7; Def.Ex. B at 10.

234. There is no evidence that minorities have been excluded from the candidate slating processes of the major political parties in Mahoning County. Def.Ex. B at 11; Tr. at 275, 307–08. Plaintiffs' witness Percy Squire, an African–American attorney in Mahoning County, Tr. at 285, testified that he has served, or currently does serve, on the Mahoning County Democrat Party candidate screening committee. Tr. at 308–09. Neither Squire nor Plaintiffs' witness E. Winther McCroom, an African–American attorney in Mahoning County, identified any barrier to African–Americans in the county Democratic or Republican party screening and nomination processes.

235. The Court has previously found that African–Americans in Ohio have suffered discrimination in the areas of education, employment, and health. Nor is there any serious dispute that there remain disparities among whites and African–Americans in several socio-economic categories as a result of such discrimination. The Court has also found, however, that Plaintiffs have failed to establish that the effects of past discrimination deny African–Americans equal access to the political process or actually hamper the ability of African–Americans to participate in the political process. The Court hereby makes these same findings with respect to Mahoning County in general, and with respect to the Court of Common Pleas for Mahoning County and the Youngstown Municipal Court in particular.

236. The Court has previously found that, in general, judicial campaigns have not been marked by overt or subtle racial appeals. Plaintiffs have identified no instances of overt or subtle racial appeals in Mahoning County for any of the challenged courts. Accordingly, the Court

hereby specifically finds that campaigns for the Court of Common Pleas for Mahoning County, and the Youngstown Municipal Court have not been marked by overt or subtle racial appeals.

237. There are 644 registered active attorneys in Mahoning County. Def.Ex. 10. Using the highest estimate provided by Plaintiffs' witnesses, there are approximately 10, or 1.6%, African–American attorneys in Mahoning County. Tr. at 282. There is no evidence concerning the total number of attorneys or the number of African–American attorneys within the territorial jurisdiction of the Youngstown Municipal Court.

238. There are currently 21 state court judges in Mahoning County, none of whom are African–American. Def.Ex. 9; Tr. at 276–77, 561.

239. There have been two judicial primary races involving black candidates in Mahoning County since 1978. Both of these were Democratic primaries for the Youngstown Municipal Court. In one of these races, the black candidate ran unopposed. In addition, two black candidates ran in a four way primary race in 1989. Both lost. Def.Ex. 15 at 41; Tr. at 275–76.

240. In general elections in Mahoning County since 1977, Judge Lloyd Haynes, a black Democrat, ran for the Youngstown Municipal Court in both 1977 and 1983. Judge Haynes won both elections against white Republicans. Def.Ex. 15 at 41; Tr. at 274, 1010–11.

241. The only other race involving an African–American candidate in Mahoning County since 1977 was a general election for a seat on the common pleas bench involving seven candidates, including Robert A. Douglas, a black Democrat. Douglas finished sixth among the seven candidates. Def.Ex. 16 at 342; Tr. at 273–74, 299–300.

242. The Court finds that justice in the Court of Common Pleas for Mahoning County and the Youngstown Municipal Court is not currently being administered in a racially discriminatory manner, and that the judges thereof are dispensing fair and impartial justice without regard to the race of the litigants. Neither Plaintiffs nor their witnesses have asserted otherwise.

### Montgomery County–Gingles Preconditions

243. According to the 1990 Census, the electoral district for the Court of Appeals for Montgomery County, Second Appellate District has a total population of 1,040,908 and a black population of 127,414, or 12.24%. Def.Ex. 7 at 1; Def.Ex. 8.

244. The African–American population in Montgomery County is primarily concentrated on the west side of the City of Dayton and Montgomery County. Tr. at 685–86.

245. The map of Second Appellate District, which includes Montgomery County, contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district. Tr. at 1529. Plaintiffs offered no evidence that a *geographically compact* single-member district could be drawn for the Second Appellate District. The Court notes that *mathematically,* there is barely sufficient African–American population within the territorial jurisdiction of the Second Appellate District to constitute a majority in a hypothetical, single-member district for that Court. Def.Ex. 7 at 1. The Court further notes, however, that there is insufficient African–American population located *within Montgomery County alone* to constitute a majority in a hypothetical single-member district for the Second Appellate District. Def.Ex. 7 at 4; Def.Ex. 8. Thus, to construct a majority-minority single-member district for the Second Appellate District, this Court would have to combine *all* of the African–American population within Montgomery with *pockets* of African–American population from the other counties within the Second Appellate

District. Accordingly, this Court finds that a *geographically compact* single-member district could not be drawn for the Second Appellate District.

246. According to the 1990 Census, Montgomery County, and, therefore, the electoral district for the Court of Common Pleas for Montgomery County, have a total population of 573,809 and a black population of 101,817, or 17.74%. Def.Ex. 7 at 4; Def.Ex. 8.

247. The map of Montgomery County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district, and Defendants' experts were unable to conclude from the information presented whether African–Americans could constitute a majority in at least one geographically compact single-member district for the Montgomery County Court of Common Pleas. Tr. at 1529. The Court notes that *mathematically*, there is sufficient African–American population in Montgomery County to constitute a majority in a hypothetical, single-member district for the Montgomery County Court of Common Pleas. Def.Ex. 7 at 4. Plaintiffs offered no evidence, however, that a *geographically compact* single-member district could be drawn for this court.

249. According to the 1990 Census, the City of Dayton, and, therefore, the electoral district for the Dayton Municipal Court has a total population of 182,044 and a black population of 75,595, or 40.43%. Def. Ex. 7 at 6; Def.Ex. 8.

250. The map of Montgomery County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district for the Dayton Municipal Court. The Court notes that *mathematically*, there is sufficient African–American population within the City of Dayton to constitute a majority in at least one hypothetical, single-member district for the Dayton Municipal Court. Def. Ex. 7 at 6. Plaintiffs offered no evidence, however, that a *geographically compact* single-member district could be drawn for the Dayton Municipal Court.

251. According to the 1990 Census, the electoral district for the Montgomery County Court District # 1, see Findings of Fact at ¶ 37, has a total population of 58,945 and a black population of 17,210, or 29.20%. Def.Ex. 7 at 8; Def.Ex. 8.

252. Plaintiffs provided no testimony with regard to the concentration of the African–American population within the territorial jurisdiction of the Montgomery County Court District # 1.

253. The map of Montgomery County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district for the Montgomery County Court District # 1. The Court notes that *mathematically*, there is sufficient African–American population within the territorial jurisdiction of the Montgomery County Court District # 1 to constitute a majority in a hypothetical, single-member district for that court. Def.Ex. 7 at 8. Plaintiffs offered no evidence, however, that a *geographically compact* single-member district could be drawn for the Montgomery County Court District # 1.

254. Plaintiffs presented no evidence, statistically valid or otherwise, that African–Americans in Montgomery County are politically cohesive or of legally significant white bloc voting in Montgomery County.

255. Dr. King's report establishes, however, that African–American judicial candidates in Montgomery County can and do win judicial elections. Judge James F. Cannon, a black Democrat, was elected to the Dayton Municipal Court in 1987 with 38% of the white vote, and was reelected without opposition in 1993. Def.Ex. A, Table 3; Tr. at 1320. Judge Arthur O. Fisher, a black Democrat, was elected to Court of Common Pleas, Juvenile Division, in 1988 without opposition. Def.Ex. A,

Table 3 at 1; Tr. at 1320. Judge Adele M. Riley, a black Democrat, was elected to the common pleas bench in 1994 without opposition. Def.Ex. A, Table 3; Tr. at 1324–25. Judge Michael B. Murphy, a black Republican, was elected to the Court of Common Pleas, Juvenile Division, in 1992 with 49% of the white vote. Def.Ex. A, Table 3; Tr. at 1323. Judge Alice O. McCollum, a black Republican, was elected to the Dayton Municipal Court in 1985 with 70% of the black vote and 54% of the white vote. Def.Ex. A, Table 3; Tr. at 1318–19. Judge McCollum was reelected in 1991 without opposition. Def.Ex. A, Table 3; Tr. at 1321. Judge Bill C. Littlejohn, a black Republican, was elected to the Dayton Municipal Court in 1993 without opposition. Def.Ex. A, Table 3; Tr. at 1324.

256. Dr. King determined that the "average degree of racial bloc voting" in Montgomery County judicial elections was 13, *i.e.*, that on average 13% more African–American voters vote for Democratic judicial candidates than do white voters. Def.Ex. A at Table 4.

257. Dr. King determined that Democratic candidates won 68% of the judicial elections in the challenged courts in Montgomery County. Def.Ex. A, Table 4. Dr. King also determined that African–American judicial candidates, whether or not they are the candidates preferred by African–American voters, won 50% of the general elections involving at least one African–American judicial candidate, and that the candidate preferred by African–American voters won 70% of the judicial elections for the challenged courts in Montgomery County. Def.Ex. A, Table 4.

### Montgomery County–Totality of Circumstances

258. As previously noted, the Plaintiffs have not asserted that there is any recent history of voting-related discrimination in Ohio. Def.Ex. 22 at 3–4, No. 5. Drs. Tuchfarber and Asher testified that there was, in fact, no such recent history of voting-related discrimination. Def.Ex. B at 10; Def.Ex. C at 11; Tr. at 1013, 1568–69, 1606–07. The Court hereby makes this same finding with respect to Montgomery County in general, and with respect to the Court of Appeals for Montgomery County, Second Appellate District, the Court of Common Pleas for Montgomery County, the Dayton Municipal Court, and the Montgomery County Court District # 1 in particular.

259. The only voting practice or procedure which Plaintiffs assert enhances the opportunity for discrimination against African–Americans is the use of at-large judicial election districts linked to the territorial jurisdictions of the Court of Appeals for Montgomery County, Second Appellate District, the Court of Common Pleas for Montgomery County, the Dayton Municipal Court, and the Montgomery County Court District # 1. Def.Ex. 22 at 4–5, No. 7; Def.Ex. B at 10.

260. There is no evidence that minorities have been excluded from the candidate slating processes of the major political parties in Montgomery County. Def.Ex. B at 11. Judge Frederick N. Young of the Court of Appeals for Montgomery County, Second Appellate District, and former Chairman of the Montgomery County Republican Party, Tr. at 1311, testified that there are no barriers to African–Americans in the county Republican party screening and nomination processes. Tr. at 1325–26.

261. Indeed, Judge Young testified that both political parties in Montgomery County have actively recruited African–American judicial candidates. Def.Ex. B at 11; Tr. at 1315–16.

262. The Court has previously found that African–Americans in Ohio have suffered discrimination in the areas of education, employment, and health. Nor is there any serious dispute that there remain disparities among whites and African–Americans in several socio-economic categories as a result of such discrimina-

tion. The Court has also found, however, that Plaintiffs have failed to establish that the effects of past discrimination deny African-Americans equal access to the political process or actually hamper the ability of African-Americans to participate in the political process. The Court hereby makes these same findings with respect to Montgomery County in general, and with respect to the Court of Appeals for Montgomery County, Second Appellate District, the Court of Common Pleas for Montgomery County, the Dayton Municipal Court, and the Montgomery County Court District # 1 in particular.

263. The Court has previously found that, in general, judicial campaigns have not been marked by overt or subtle racial appeals. Plaintiffs have identified no instances of overt or subtle racial appeals in Montgomery County for any of the challenged courts. Plaintiffs' only witness from Montgomery County, Jesse Gooding, testified that although he generally believes that there has been campaigning within the county in which the candidates were identified by race, he could not recall any such specific instances. Tr. at 689. Accordingly, the Court hereby specifically finds that campaigns for the Court of Appeals for Montgomery County, Second Appellate District, the Court of Common Pleas for Montgomery County, the Dayton Municipal Court, and the Montgomery County Court District # 1 have not been marked by overt or subtle racial appeals.

264. There are 1,665 registered active attorneys in Montgomery County. Def. Ex. 10. The only estimate provided during trial for the number of African-American attorneys in Montgomery County was the number of attorneys listed in the *1995–1996 Ohio Attorneys of Color Directory* prepared by Plaintiffs' witness, Judge Adrine. Def .Ex. 10. Although that directory is most likely incomplete, Tr. at 67–68, 70, it is currently the best resource available for this information. Tr. at 128. According to this list prepared by Judge Adrine, there are approximately 27, or 1.6%, African-American attorneys in Montgomery County. Def.Ex. 10. There is no evidence concerning the total number of attorneys or the number of African-American attorneys within the territorial jurisdictions of the Second District Court of Appeals, the Dayton Municipal Court, or the Montgomery County Court District # 1.

265. There are currently 36 state court judges in Montgomery County, including 5, or 13.9%, African-American judges. Currently, there are no African-Americans serving on the Court of Appeals for Montgomery County, Second Appellate District, two African-Americans, Judge Michael B. Murphy of the Juvenile Division and Judge Adele M. Riley of the General Division, serving on the Court of Common Pleas for Montgomery County, three African-Americans, Judges James F. Cannon. Bill C. Littlejohn, and Alice O. McCollum, serving on the Dayton Municipal Court, and no African-Americans serving on the Montgomery County Court District # 1. Def. Ex. 9; Tr. at 56, 697–98, 706–07, 1331–32.

266. There were nine judicial primary races involving African-American candidates in Montgomery County between 1978 and 1996. Seven black candidates won—four Republicans and three Democrats. In five of these races, black candidates ran unopposed. In the four contested races, two black candidates won and two black candidates lost, both in three way races. Def.Ex. 15 at 30–31, 36; Tr. at 1566. The two three-way primaries in which African-American candidates lost were Republican primaries for seats on the Court of Appeals for Montgomery County, Second Appellate District, in 1980 and 1986. Def.Ex. 15 at 30.

267. In general elections in Montgomery County between 1977 and 1996, there were nineteen races involving black candidates. Black candidates won fifteen of these races. Two races pitted two black candidates against each other, and six of the races were not contested. Of the thirteen contested races, black candidates won

nine races. Seven successful black candidates were Republicans, and two were Democrats. Three unsuccessful black candidates were Republicans, and one was a Democrat. Def.Ex. 15 at 32–36; Tr. at 1566. Since 1978, there have been no elections involving African–American candidates for the Court of Appeals for Montgomery County, Second Appellate District. Def.Ex. 15 at 32–35.

268. Although Plaintiffs challenge the Dayton Municipal Court in this case, black candidates for this court have fared extremely well. Of the twelve judicial races for a seat on the Dayton Municipal Court between 1977 and 1995, black candidates won ten of these races. Def.Ex. 15 at 32–34; Tr. at 706.

269. With regard to the Montgomery County Court District # 1, there was only one race involving a black candidate. In 1992, Judge Adele M. Riley, a black Democrat, won in a four way race for three seats. Def.Ex. 15 at 34; Tr. at 1323–24. Judge Riley was subsequently elected to the Montgomery County Court of Common Pleas in 1994. Def.Ex. 15 at 34; Tr. at 1324–25.

270. There have been six races involving black candidates for the Court of Common Pleas of Montgomery County since 1977. Judge Arthur O. Fisher, a black Democrat, ran unopposed for the Domestic Relations Division in 1982. Def.Ex. 15 at 32; Tr. at 1318. Judge Fisher again ran unopposed in 1988, this time for the Juvenile Division seat. Def.Ex. 15 at 33; Tr. at 1320. Judge Michael B. Murphy, a black Republican, lost a race for the Court of Common Pleas, General Division, to a white Democrat in 1990, Def.Ex. 15 at 33; Tr. at 1321, but won a contested race for the Juvenile Division in 1992 against a white Democrat. Def.Ex. 15 at 34; Tr. at 1322–23. In his 1990 unsuccessful race, Judge Murphy received 41% of the white vote and 43% of the black vote. Def.Ex. A, Table 3. In his successful 1992 race, Judge Murphy received 49% of the white vote and 62% of the black vote, and 51% of the overall vote. Def.Ex. A, Table 3. In 1994, Judge Riley, a black Democrat, ran unopposed for a seat on the Court of Common Pleas. Def.Ex. 15 at 34; Tr. at 1324–25. And in 1996, Judge David A. Gowdown, a white Republican and a sitting Montgomery County Court judge, defeated Frances McGee–Cromarties, a black Democrat, for a seat on the Common Pleas bench. Def.Ex. 15 at 35; Tr. at 1325.

271. The Court finds that justice in the Court of Appeals for Montgomery County, Second Appellate District, the Court of Common Pleas for Montgomery County, the Dayton Municipal Court, and the Montgomery County Court District # 1 is not currently being administered in a racially discriminatory manner, and that the judges thereof are dispensing fair and impartial justice without regard to the race of the litigants. Neither Plaintiffs nor their witnesses have asserted otherwise.

### *Summit County–Gingles Preconditions*

272. According to the 1990 Census, Summit County, and, therefore, the electoral district for the Court of Common Pleas for Summit County, have a total population of 514,990 and a black population of 61,185, or 11.88%. Def.Ex. 7 at 5; Def.Ex. 8.

273. The African–American population in Summit County is primarily concentrated in the central city area of the City of Akron in Wards 3 through 5. Tr. at 620, 720–21. There are also pockets of African–American population in the suburban communities of Barberton and Twinsburg. Tr. at 620, 721.

274. The map of Summit County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district, and Defendants' experts were unable to conclude from the information presented whether African–Americans could constitute a majority in at least one geographically compact single-member district for

the Summit County Court of Common Pleas. Tr. at 1531. The Court notes that *mathematically*, there is sufficient African–American population in Summit County to constitute a majority in a hypothetical, single-member district for the Summit County Court of Common Pleas. Def.Ex. 7 at 5. Plaintiffs offered no evidence, however, that a *geographically* compact single-member district could be drawn for this court.

275. According to the 1990 Census, the electoral district for the Akron Municipal Court, see Findings of Fact at ¶ 28, has a total population of 263,247 and a black population of 55,086, or 20.93%. Def.Ex. 7 at 7; Def.Ex. 8.

276. The map of Summit County contained in Pl.Ex. 45 is, in and of itself, inadequate to establish whether African–Americans could constitute a majority in a hypothetical single-member district for the Akron Municipal Court. The Court notes that *mathematically*, there is sufficient African–American population within the electoral district for the Akron Municipal Court to constitute a majority in a hypothetical, single-member district for the Akron Municipal Court. Def.Ex. 7 at 7. Plaintiffs offered no evidence, however, that a *geographically compact* single-member district could be drawn for the Akron Municipal Court.

277. Plaintiffs presented no evidence, statistically valid or otherwise, that African–Americans in Summit County are politically cohesive or of legally significant white bloc voting in Summit County. Tr. at 1010.

278. Dr. King's report establishes, however, that African–American judicial candidates in Summit County can and do win judicial elections. Judge James R. Williams, a black Democrat, was elected to the common pleas bench in 1990 with 54% of the white vote, and was reelected in 1992 with 47% of the white vote. Def.Ex. A, Table 3; Tr. at 1006. Judge Carla D. Moore, a black Democrat, was elected to the Akron Municipal Court in 1989, and

was reelected in 1995 with 62% of the white vote. Def.Ex. A, Table 3; Tr. at 1008. Judge Saundra Robinson, a black Republican, was elected to the Court of Common Pleas, Juvenile Division, in 1990 with 78% of the black vote and 51% of the white vote. Def.Ex. A, Table 3; Tr. at 1006–07.

279. Dr. King determined that the "average degree of racial bloc voting" in Summit County judicial elections was 17, *i.e.*, that on average 17% more African–American voters vote for Democratic judicial candidates than do white voters. Def.Ex. A at Table 4.

280. Dr. King determined that Democratic candidates win 46% of the judicial elections in the challenged courts in Summit County. Def.Ex. A, Table 4. Dr. King also determined that African–American judicial candidates, whether or not they are the candidates preferred by African–American voters, won 67% of the general elections involving at least one African–American judicial candidate, and that the candidate preferred by African–American voters won 79% of the judicial elections for the challenged courts in Summit County. Def.Ex. A, Table 4.

### *Summit County—Totality of Circumstances*

281. As previously noted, the Plaintiffs have not asserted that there is any recent history of voting-related discrimination in Ohio. Def.Ex. 22 at 3–4, No. 5. Drs. Tuchfarber and Asher testified that there was, in fact, no such recent history of voting-related discrimination. Def.Ex. B at 10; Def.Ex. C at 11; Tr. at 1013, 1568–69, 1606–07. The Court hereby makes this same finding with respect to Summit County in general, and with respect to the Court of Common Pleas for Summit County and the Akron Municipal Court in particular.

282. The only voting practice or procedure which Plaintiffs assert enhances the opportunity for discrimination against Af-

rican–Americans is the use of at-large judicial election districts linked to the territorial jurisdictions of the Court of Common Pleas for Summit County, and the Akron Municipal Court. Def.Ex. 22 at 4–5, No. 7; Def.Ex. B at 10.

283. There is no evidence that minorities have been excluded from the candidate slating processes of the major political parties in Summit County. Def.Ex. B at 11; Tr. at 739–40, 1128–29. Alexander Arshinkoff, Chairman of the Summit County Republican Party, Tr. at 1104–05, testified that there are no barriers to African–Americans in the county Republican party screening and nomination processes. Tr. at 1128–29,

284. Indeed, Chairman Arshinkoff testified that both political parties in Summit County have actively recruited African–American judicial candidates. Def.Ex. B at 11; Tr. at 1112–13, 1133, 1136.

285. The Court has previously found that African–Americans in Ohio have suffered discrimination in the areas of education, employment, and health. Nor is there any serious dispute that there remain disparities among whites and African–Americans in several socio-economic categories as a result of such discrimination. The Court has also found, however, that Plaintiffs have failed to establish that the effects of past discrimination deny African–Americans equal access to the political process or actually hamper the ability of African–Americans to participate in the political process. The Court hereby makes these same findings with respect to Summit County in general, and with respect to the Court of Common Pleas for Summit County, and the Akron Municipal Court in particular.

286. The Court has previously found that, in general, judicial campaigns have not been marked by overt or subtle racial appeals. Plaintiffs have identified no instances of overt or subtle racial appeals in Summit County for either of the challenged courts. Representative Sykes testified that his opponent in one of his races

for the State House of Representatives used an unflattering picture of him in a piece of campaign literature, and that he believed that such use was an appeal to voters along racial lines. Tr. at 630–31. Sykes further testified that this racial appeal created an "uproar" and backfired. Tr. at 631. The Court hereby specifically finds that campaigns for the Court of Common Pleas for Summit County and the Akron Municipal Court have not been marked by overt or subtle racial appeals.

287. There are 1,736 registered active attorneys in Summit County. Def.Ex. 10. Using the highest estimate provided by Plaintiffs' witnesses, there are approximately 65, or 3.7%, African–American attorneys in Summit County. Tr. at 762. There is no evidence concerning the total number of attorneys or the number of African–American attorneys within the territorial jurisdiction of the Akron Municipal Court.

288. There are currently 27 state court judges in Summit County, including 2, or 7.4%, African–American judges. Currently, there is one African–American, Judge James R. Williams, serving on the Court of Common Pleas for Summit County, and one African–American, Judge Carla D. Moore, serving on the Akron Municipal Court. Def.Ex. 9; Tr. at 638, 643–44, 733.

289. There have been five judicial primary races involving black candidates in Summit County since 1979. Black candidates won three of these races, running unopposed. Def.Ex. 15 at 46, 50; Tr. at 669, 1009. Three of the races involved James R. Williams, a black who lost the Democratic primary in 1986 for a seat on the Ninth District Court of Appeals, Def. Ex. 15 at 46, Tr. at 668, but was unopposed in Democratic primaries for the Common Pleas bench in 1990 and 1992. Def.Ex. 15 at 46. The other two races involve Saundra Robinson, who was unopposed in the Republican primary for the Court of Common Pleas, Juvenile Division, in 1990, but was defeated in the 1996 Republican pri-

mary for Juvenile bench following frequent unfavorable publicity for having imposed lenient sentences on juvenile defendants. Def.Ex. 15 at 46; Tr. at 676, 1007, 1127–28, 1140–41, 1144.

290. In general elections since 1975, African–American candidates ran in fourteen judicial races. Black candidates won ten of these fourteen elections. One black candidate was unopposed. Of the ten successful black candidates, three were Republicans and seven were Democrats. Of the four unsuccessful black candidates, one was Republican and three were Democrats. Def.Ex. 15 at 47–50; Def.Ex. 16 at 242; Tr. at 672–73, 1009–10, 1108–10, 1123, 1130–32.

291. There were three general election races involving African–American candidates for the Summit County Court of Common Pleas. African–American candidates won all three races. In 1990, Judge James R. Williams, a black Democrat, defeated Edward A. Bayer, a white Republican. Judge Williams received 54% of the white vote and 57% of the total vote. Def. Ex. A, Table 3; Def.Ex. 15 at 48; Tr. at 751, 1006, 1119–20. Also in 1990, Saundra Robinson, a black Republican, defeated John E. Vuillemin, a white Democrat running as an incumbent. Judge Robinson received 51% of the white vote and 53% of the total vote. Def.Ex. A, Table 3; Def. Ex. 15 at 48; Tr. at 752, 1006–07, 1120–22. In 1992, Judge Williams was reelected by defeating Patricia Cosgrove, a white Republican. Judge Williams received 47% of the white vote and 50% of the total vote, winning 95,696 to 94,984 in a very tight race. Def.Ex. A, Table 3; Def.Ex. 15 at 48; Tr. at 753, 1007–08, 1122–23.

292. With regard to the Akron Municipal Court, there have been ten races since 1975 involving black candidates. Black candidates won seven of these races. Def. Ex. 15 at 47–50.

293. This Court finds that justice in the Court of Common Pleas for Summit County, and the Akron Municipal Court is not currently being administered in a racially discriminatory manner, and that the judges thereof are dispensing fair and impartial justice without regard to the race of the litigants. Neither Plaintiffs nor their witnesses have asserted otherwise.

## II. CONCLUSIONS OF LAW

### Plaintiffs' Assertions of the Lack of Proportional Representation

1. Plaintiffs allege that African Americans have not been elected to the bench in Ohio in numbers roughly equal to their percentage of total population. See Complaint at ¶¶ 4a–c, 5, & 26. At trial, Plaintiffs' witnesses continually referred to the lack of proportional representation on most of the challenged courts. Tr. at 74–75, 437–38, 677. In and of themselves, however, these assertions are insufficient to establish a violation of § 2 of the Voting Rights Act. Williams v. State Bd. of Elections, 696 F.Supp. 1563, 1567 (N.D.Ill. 1988). See also Johnson v. DeGrandy, 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994).

■ 2. Section 2 does not guarantee that minorities will be elected in proportion to their percentage of the total population. White v. Alabama, 74 F.3d 1058, 1071–72 (11th Cir.1996). Consequently, evidence that merely establishes that members of a particular minority group have historically not been elected in numbers roughly equal to their population is insufficient to prove a violation of § 2. Thornburg v. Gingles, 478 U.S. 30, 46, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). See also League of United Latin Am. Citizens, Council No. 4434 v. Clements, 999 F.2d 831 (5th Cir.1993) (en banc), cert. denied, 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994) ("LULAC"); Williams, 696 F.Supp. at 1567; Bradley v. Work, 916 F.Supp. 1446, 1470 (S.D.Ind.1996).

■ 3. Even if Plaintiffs' allegations that African–Americans have not enjoyed success at the polls do state a claim, the success of minority judicial candidates

must be assessed in relation to the number of African–Americans qualified to run for judicial office, and not in relation to the total population of African–Americans in Ohio. *LULAC,* 999 F.2d at 865–67. See also *Id.,* 999 F.2d at 893; *Southern Christian Leadership Conference of Ala. v. Evans,* 785 F.Supp. 1469, 1476–77 (M.D.Ala. 1992), *aff'd,* 56 F.3d 1281 (11th Cir.1995) *(en banc ), cert. denied,* 516 U.S. 1045, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996) *("SCLC I ");* *Southern Christian Leadership Conference of Ala. v. Sessions,* 56 F.3d 1281, 1296 (11th Cir.1995) *(en banc ), cert. denied,* 516 U.S. 1045, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996) *("SCLC II ");* *Milwaukee Branch of the N.A.A.C.P. v. Thompson,* 935 F.Supp. 1419, 1431–32 (E.D.Wis. 1996), *aff'd* 116 F.3d 1194 (7th Cir.1997) *("Milwaukee Branch of the N.A.A.C.P. II");* *Martin v. Allain,* 658 F.Supp. 1183, 1203 (S.D.Miss.1987); *Al–Hakim v. Florida,* 892 F.Supp. 1464, 1470–71 (M.D.Fla. 1995), *aff'd,* 99 F.3d 1154 (11th Cir.1996).

4. When the success of African–American judicial candidates is considered in light of the proper statistical pool, it is clear that, for most of the challenged courts, African–American candidates enjoy success in numbers in excess of their percentage of lawyers qualified to hold judicial office.

### Proof Required to Establish Claim under § 2 of the Voting Rights Act

5. The Voting Rights Act, and in particular § 2, was enacted:

to give those who had been disenfranchised on account of their race the opportunity to participate in the political process. The Act is designed to redress past discrimination that inhibited the ability of minorities to express their preference for certain candidates through the electoral process, i.e., at the ballot box. Sections 4 and 5 of the Act prohibit the use of tests or devices, and the alteration of voting qualifications or procedures, in a manner that deprives

citizens of their right to vote. Section 2 proscribes practices that, while permitting a mechanical exercise of the right to vote, dilute the votes of a racial minority (through gerrymandering or other tactics) and thus render its votes meaningless. In essence, the Act empowers minorities by providing them meaningful access to the ballot box.

*White v. Alabama,* 74 F.3d at 1069 (footnote and citations omitted). See also *Al–Hakim,* 892 F.Supp. at 1472–73.

6. "In 1991, the Supreme Court extended Section 2 to reach state judicial elections," *Cousin v. McWherter,* 46 F.3d 568, 574 (6th Cir.1995) (citing *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991)), and specifically to the election of state trial court judges. *Houston Lawyers' Ass'n v. Attorney General,* 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991).

7. The proof required to establish a claim under § 2 is now well-established:

In *Thornburg v. Gingles,* [the Supreme] Court held that Plaintiffs claiming vote dilution through the use of multimember districts must prove three threshold conditions. First, they must show that the minority group " 'is sufficiently large and geographically compact to constitute a majority in a single-member district.' " Second, they must prove that the minority group " 'is politically cohesive.' " Third, the plaintiffs must establish " 'that the white majority votes sufficiently as a block to enable it … usually to defeat the minority's preferred candidate.' "

*Voinovich v. Quilter,* 507 U.S. 146, 157, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (citations omitted). The *Gingles* "preconditions" must also be established in a § 2 challenge to the at-large election of state judges. *Nipper v. Smith,* 39 F.3d 1494, 1524 (11th Cir.1994) *(en banc ), cert. denied,* 514 U.S. 1083, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995).

8. The Court must, and has, "examine[d] [the *Gingles* preconditions] on the basis of the individual challenged circuits and districts." *SCLC I,* 785 F.Supp. at 1473. See also *Brooks v. State Bd. of Elections,* 848 F.Supp. 1548, 1554 n. 6 (S.D.Ga.1994), *appeal dismissed as moot,* 59 F.3d 1114 (11th Cir.1995); *Clark v. Roemer,* 777 F.Supp. 445, 450, 454, 463 (M.D.La.1990), *readopted,* 777 F.Supp. 471 (M.D.La.1991), *appeal dismissed,* 958 F.2d 614 (5th Cir.1992); *Magnolia Bar Ass'n, Inc. v. Lee,* 793 F.Supp. 1386, 1395 (S.D.Miss.1992), *aff'd,* 994 F.2d 1143 (5th Cir.), *cert. denied,* 510 U.S. 994, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993) (*"Magnolia Bar Ass'n I"*).

■ 9. "Although courts are to use a flexible, fact-sensitive approach to determine whether a particular electoral scheme violates § 2, plaintiffs bear the burden of proving such a violation occurred." *Bradley v. Work,* 916 F.Supp. at 1470. "[A] Section 2 violation can [not] be proven where the three *Gingles* preconditions have not been established." *Cousin,* 46 F.3d at 577. See also *LULAC,* 999 F.2d at 849; *Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1423; *Clark v. Roemer,* 777 F.Supp. at 452.

### Sufficiently Large and Geographically Compact Minority Group

■ 10. To satisfy the first *Gingles* precondition, the African–American voting age population in a judicial district must be so numerous as to constitute more than 50% of the population of at least one single-member district. *Clarke,* 40 F.3d at 815. See also *Magnolia Bar Ass'n, Inc. v. Lee,* 994 F.2d 1143, 1148, 1150 (5th Cir.), *cert. denied,* 510 U.S. 994, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993) (*"Magnolia Bar Ass'n II"*); *Westwego Citizens for Better Gov't v. City of Westwego,* 906 F.2d 1042, 1046 (5th Cir.1990); *Al–Hakim,* 892 F.Supp. at 1474; *Magnolia Bar Ass'n, I,* 793 F.Supp. at 1397–98; *Concerned Citizens for Equality v. McDonald,* 863 F.Supp. 393, 402, 404 (E.D.Tex.1994), *aff'd,*

63 F.3d 413 (5th Cir.1995) (*"Concerned Citizens for Equality"*); *Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1424. Plaintiffs must also establish that the minority population is geographically compact enough to be included within the same hypothetical single-member district. *Magnolia Bar Ass'n I,* 793 F.Supp. at 1398.

■ 11. "[T]he concept of one-man, one-vote apportionment does not apply to the judicial branch of government," *Wells v. Edwards,* 347 F.Supp. 453, 454 (M.D.La. 1972), *aff'd,* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973). See also *Nipper,* 39 F.3d at 1510 n. 33; *Buchanan v. Gilligan,* 349 F.Supp. 569, 571 (N.D.Ohio 1972); *Clark v. Edwards,* 725 F.Supp. 285, 294 (M.D.La.1988), *appeal dismissed,* 958 F.2d 614 (5th Cir.1992). Nevertheless, if this court were to order the creation of subdistricts, those "subdistricts—for whatever purpose created—must contain substantially equal populations." *Clark v. Roemer,* 777 F.Supp. at 453.

12. "No vote dilution claim exists under § 2 of the Voting Rights Act if expansion of the size of the existing governing body must occur to satisfy the first *Gingles* factor." *Concerned Citizens for Equality I,* 863 F.Supp. at 404. See also *Concerned Citizens for Equality v. McDonald,* 63 F.3d 413, 417 (5th Cir.1995) (citing *Holder v. Hall,* 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994)) (*"Concerned Citizens for Equality II"*); *Clark v. Roemer,* 777 F.Supp. at 463. Consequently, dividing the total population of the existing judicial district by the number of judicial positions to arrive at the number of residents in a hypothetical subdistrict is the appropriate measure to determine whether Plaintiffs can satisfy the first *Gingles* precondition.

13. The Court has previously entered summary judgment on Plaintiffs' § 2 claims with regard to the Sixth District Court of Appeals and the Court of Common Pleas for Stark County for the reason that Plaintiffs concede that the African-

American population within the territorial jurisdictions of these courts is insufficient to create a geographically compact, hypothetical, majority-minority, single-member district. D. 83. In their pending Motion for Partial Summary Judgment, the Defendants maintain that there is insufficient African–American population in nineteen additional *divisions* of the challenged courts to constitute a majority in a hypothetical single-member district for those *divisions*. Plaintiffs, on the other hand, contend that this Court must not treat each division of the common pleas and municipal courts separately in determining whether Plaintiffs have satisfied the first *Gingles* precondition. The Court finds it unnecessary to reach this issue.

### Political Cohesion of African–American Voters

14. The final two *Gingles* preconditions require this Court to examine the extent to which voting in Ohio's judicial elections is "racially polarized."

> The purpose of inquiring into the existence of racially polarized voting is two-fold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates. Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices. A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2.

*Gingles,* 478 U.S. at 56, 106 S.Ct. 2752 (citations omitted).

15. A minority group is "cohesive" if that group usually has a "candidate of choice." *Id.* "Bloc voting by blacks tends to prove that the black community is politi- cally cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." *Gingles,* 478 U.S. at 68, 106 S.Ct. 2752. " 'Black candidate of choice' is a term of art referring to a candidate who is preferred by the majority of black voters, without reference to the candidate's race." *Nipper,* 39 F.3d at 1507 n. 25. See also *Clarke,* 40 F.3d at 810 n. 1; *Mallory v. Eyrich,* 707 F.Supp. 947, 951 (S.D.Ohio 1989).

### Legally Significant White Bloc Voting

16. "[T]he question here is not whether white residents tend to vote as a bloc, but whether such bloc voting is 'legally significant.' " *LULAC,* 999 F.2d at 850. "[B]loc voting [is] a matter of degree, with a variable legal significance depending on other facts...." *Johnson v. De Grandy,* 114 S.Ct. at 2657 (citation omitted). "[I]n general, a white bloc vote that normally will defeat the combined strength of minority vote support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles,* 478 U.S. at 56, 106 S.Ct. 2752.

> The amount of white bloc voting that can generally "minimize or cancel" black voters' ability to elect representatives of their choice, however, will vary from district to district according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting; the percentage of registered voters in the district who are members of the minority group; the size of the district; and in multimember districts, the number of seats open and the number of candidates in the field.

*Gingles,* 478 U.S. at 56, 106 S.Ct. 2752 (footnote and citations omitted). See also *Rangel v. Morales,* 8 F.3d 242, 245 (5th Cir.1993); *Martin v. Allain,* 658 F.Supp. at 1202; *Mallory,* 707 F.Supp. at 951.

■ 17. "A pattern of bloc voting over an extended period of time is more probative of legally significant bloc voting than are isolated incidents." *Mallory,* 707 F.Supp. at 951 (citations omitted). See also *Gingles,* 478 U.S. at 57, 106 S.Ct. 2752. A finding that legally significant white bloc voting exists cannot be based upon an isolated race or races. *Rangel,* 8 F.3d at 248–49.

18. Evidence of racially polarized voting for the office or offices at issue is the most probative evidence of legally significant racial bloc voting. *Magnolia Bar Ass'n II,* 994 F.2d at 1149. See also *SCLC I,* 785 F.Supp. at 1473. When faced with low-profile elections for which there are many uncontested races, however, the court may consider election results for other offices, or so-called "exogenous elections." *Al–Hakim,* 892 F.Supp. at 1476. See also *Rangel,* 8 F.3d at 246; *Bradley v. Work,* 916 F.Supp. at 1471; *Magnolia Bar Ass'n I,* 793 F.Supp. at 1399. In this case, there are sufficient judicial races from which Defendants' expert could conclude that legally significant racial bloc voting does not exist in the challenged judicial districts.

19. Races involving minority candidates are more probative of racially polarized voting than are races involving white candidates only. *Clarke,* 40 F.3d at 811–12. See also *LULAC,* 999 F.2d at 864; *Magnolia Bar Ass'n II,* 994 F.2d at 1149; *Nipper,* 39 F.3d at 1539–40; *Rangel,* 8 F.3d at 246 n. 4; *Bradley v. Work,* 916 F.Supp. at 1470; *Clark v. Roemer,* 777 F.Supp. at 454; *Magnolia Bar Ass'n I,* 793 F.Supp. at 1399; *Mallory,* 707 F.Supp. at 952; *SCLC I,* 785 F.Supp. at 1473.

■ 20. The absence of white challengers to black incumbent judges is indicative of the lack of legally significant racial bloc voting:

Uncontested elections involving incumbent black judges are also relevant to the issue of white bloc voting in the context of judicial elections. If a white majority voting bloc is able "usually" to defeat a black candidate, then one might expect to see, with some degree of frequency, challenges by white candidates against black incumbents, and, where a challenge was mounted, the black candidate losing. This pattern is not present in the instant case.

*Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1428 (citations omitted). The subsequent electoral success of minority judges who had originally been appointed to the bench is also relevant in the racial bloc voting inquiry and must not be discounted. *SCLC I,* 785 F.Supp. at 1474–75.

21. Although expert statistical evidence is not always required to establish racial bloc voting, *Magnolia Bar Ass'n II,* 994 F.2d at 1149, the failure to offer statistical evidence on the third *Gingles* precondition can be fatal to a § 2 claim. *Al–Hakim,* 892 F.Supp. at 1474–76.

22. The absence of statistical evidence supporting Plaintiffs' assertions of legally significant racial bloc voting is particularly significant in cases challenging at-large, county-wide judicial elections:

Even if this Court found that racial polarization had occurred to an extent that satisfied the third *Gingles* precondition, that finding would not automatically lead to a conclusion that § 2 was violated. In light of the state's substantial legitimate interest in linking the jurisdiction of the county division judges with their electoral base, such a finding would not be enough to avoid summary judgment.

To outweigh the state's interest in the at-large, county-wide elections of judges who have county-wide jurisdiction, the Voters need more than marginal evidence of vote dilution. Viewing the evidence of record, the Voters have no evidence of racial polarization in judicial elections and very little evidence of it in any other elections. Had this evidence allowed the Voters to meet the *Gingles* preconditions, it would not be enough to outweigh the state's interest.

*Bradley v. Work,* 916 F.Supp. at 1473 (citations omitted). See also *LULAC,* 999 F.2d at 868; *Id.,* 999 F.2d at 876; *Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1431.

23. In the instant case, the State of Ohio has a substantial interest in maintaining the link between the electoral bases and, for the most part, the county-wide jurisdictional bases of its courts. This interest cannot be overcome by "marginal" evidence of racial bloc voting.

24. As previously noted, no official statistics are kept as to why voters vote as they do in any particular election, and a statistical or other empirical analyses of election results must be conducted to determine the extent of racial bloc voting in each election.

25. In *Gingles,* two complimentary methods of analyses—extreme case analysis and bivariate ecological regression analysis—were employed to scientifically measure, within an acceptable margin of error, the voting patterns of the two races. The Supreme Court described the approach employed in that case:

> Dr. Grofman collected and evaluated data from 53 General Assembly primary and general elections involving black candidacies. These elections were held over a period of three different election years in the six originally challenged multimember districts. Dr. Grofman subjected the data to two complementary methods of analysis—extreme case analysis and bivariate ecological regression analysis—in order to determine whether blacks and whites in these districts differed in their voting behavior. These analytic techniques yielded data concerning the voting patterns of the two races, including estimates of the percentages of members of each race who voted for black candidates.

*Gingles,* 478 U.S. at 52–53, 106 S.Ct. 2752.

### Totality of Circumstances

26. Even if Plaintiffs establish the three *Gingles* preconditions with respect to every court still at issue herein, Plaintiffs cannot succeed on a their § 2 claim unless they establish that African–Americans do not have the same "opportunity [as] other members of the electorate to participate in the political process and elect representatives of their choice." 42 U.S.C. § 1973(b).

> Satisfaction of these three [*Gingles*] "preconditions" is necessary, but not sufficient to establish liability under § 2. Plaintiffs must also show that, under the "totality of circumstances," they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters.

*LULAC,* 999 F.2d at 849 (citations omitted). See also *Johnson v. De Grandy,* 114 S.Ct. at 2657; *Cousin,* 46 F.3d at 575; *Nipper,* 39 F.3d at 1513; *Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1423; *Magnolia Bar Ass'n,* 793 F.Supp. at 1386.

27. "Ultimately, the *Gingles* threshold inquiry and the broad, totality of circumstances inquiry are designed to probe whether the challenged election practice 'has resulted in the denial or abridgement of the right to vote based on color or race.'" *Magnolia Bar Ass'n II,* 994 F.2d at 1146.

28. "The burden of proving vote dilution under the totality of the circumstances remains with the plaintiff...." *Nipper,* 39 F.3d at 1524 n. 61. See also *Voinovich,* 507 U.S. at 156, 113 S.Ct. 1149.

29. "The Senate Report [accompanying the 1982 Voting Rights Act Amendments] specifies factors which typically may be relevant to a § 2 claim...." *Gingles,* 478 U.S. at 44, 106 S.Ct. 2752.

(1) the history of voting-related discrimination in the State or political subdivision;

(2) the extent to which voting in the elections of the State or political subdivision is racially polarized;

(3) the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

(4) the exclusion of members of the minority group from candidate slating processes;

(5) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6) the use of overt or subtle racial appeals in political campaigns; and

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles,* 478 U.S. at 44–45, 106 S.Ct. 2752.

The Report notes also that the evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value. The Report stresses, however, that this list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered. Furthermore, the Senate Committee observed that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." Rather, the Committee determined that "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and

present reality,' and on a functional view of the political process." *Gingles,* 478 U.S. at 45, 106 S.Ct. 2752 (footnote and citations omitted).

■ 30. "[I]n the context of the Voting Rights Act as applied to 'present reality,' the extent to which black citizens fail to exercise their obligations to vote diminishes the weight to be given the history of official discrimination." *Magnolia Bar Ass'n I,* 793 F.Supp. at 1408 (citation omitted).

31. The state's history of discrimination and the effects to which African-Americans bear the effects of that discrimination in the areas of education, employment, and health "by themselves, are insufficient to support [a] 'finding' that minorities do not enjoy equal access to the political process absent some indication that these effects of past discrimination actually hamper the ability of minorities to participate." *LULAC,* 999 F.2d at 866. See also *Johnson v. De Grandy,* 114 S.Ct. at 2656.

### *Modification of the Totality Analysis for Judicial Elections*

■ 32. Because of the uniqueness of judicial elections, numerous courts have noted the analysis of these "totality of the circumstances" factors must be modified when resolving a § 2 claim involving elected judiciaries. *Nipper,* 39 F.3d at 1529, 1535; *Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1430; *Bradley v. Work,* 916 F.Supp. at 1467.

33. One factor that must be modified when considering the totality of circumstances in judicial elections is the "responsiveness" to minority needs. *Nipper,* 39 F.3d at 1535.

In assessing the totality of circumstances, the nature of a judicial election must be kept in mind. Unlike legislators, judges are not "representatives" of the voting public. Trial and appellate court judges are not elected to be responsive to their voters nor are they

expected to advance the agenda of any particular interest group. Indeed, such conduct would constitute a violation of the ethical oath which the judges ... swear to uphold.

*Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1430 (citations omitted).

A key difference between judicial elections and corresponding elections of other types of representatives is that judges are not elected to be responsive to constituents, nor are they expected to pursue an agenda on behalf of a particular group. They do not make their decisions as part of a collective body, with active debate about the issues, subsequent negotiation, compromise, and then a decision rendered by majority vote. Instead judges exercise their power independently. Judges "represent" their constituents by adhering to legal precedent, deliberating carefully over whether such precedent is inapplicable, and by deciding the disputes before them in a fair and unbiased manner.

Thus, the way to assess whether judges are representing all of their constituents is to consider whether they are administering justice in a fair and impartial way. If the Voters can show that minority litigants who appear before judges in the county division historically have been deprived of both a fair and impartial resolution of their claims and an equal opportunity to elect judges of their choice, then they will have demonstrated a situation that demands a remedy. The goal is equal justice for all, regardless of race, and if the means used for electing judges has the effect of diluting the voting strength of minorities such that they are unable to elect the judges of their choice, and if the judges who are elected render decisions in a racially discriminatory manner, this Court is required to act.

*Bradley v. Work,* 916 F.Supp. at 1467 (footnote and citations omitted). See also *Clark v. Edwards,* 725 F.Supp. at 301.

■ 34. Another modification of the totality of circumstances analysis for judicial elections is that "[b]ecause of the low-profile nature of judicial campaigns, the effects of incumbency and success in the appointment process tend to be more probative in judicial elections than in the legislative context...." *Nipper,* 39 F.3d at 1535.

■ 35. A further modification of the totality of circumstances analysis for judicial elections is that the extent to which minorities have been elected to judicial office must be assessed in light of the number of minority group members eligible to run for and hold judicial office. See Conclusions of Law at ¶ 3. Section 2 of the Voting Rights Act itself provides that "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered...." 42 U.S.C. § 1973(b). This circumstance must be assessed in light of "the number of minority candidates eligible to serve on the bench." *Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1430.

■ 36. Particularly relevant in § 2 cases challenging the at-large election of state judges is the state's interest in maintaining the link between judges' electoral bases and their territorial jurisdiction. "[T]he substantiality of [a state's] interest under § 2 is a question of law for this court to determine de novo and not a question of fact that somehow will be described on a county-by-county basis." *LULAC,* 999 F.2d at 871.

37. The United States Supreme Court has held that a state's "linkage" interest "is a factor to be considered by the court in evaluating whether the evidence in a particular case supports a finding of a vote dilution violation in an election for a single-member office." *Houston Lawyers' Ass'n,* 501 U.S. at 426, 111 S.Ct. 2376 (emphasis in original). Moreover, the Supreme Court concluded that this "linkage" inter-

est is a legitimate one. *Houston Lawyers' Ass'n,* 501 U.S. at 426–27, 111 S.Ct. 2376. See also *Bradley v. Work,* 916 F.Supp. at 1467.

38. The Sixth Circuit has determined that a state's "linkage" interest must be weighed as a separate factor in the totality of the circumstances analysis, and that it is, *as a matter of law,* a substantial interest. *Cousin,* 46 F.3d at 576–77.

39. The Sixth Circuit further concluded that although the state's interest in linkage "does not automatically outweigh proof of racial vote dilution," Voting Rights Act "plaintiffs must produce evidence supporting the dilution claim sufficient to carry their burden of outweighing the state's interest." *Cousin,* 46 F.3d at 577. "[B]ecause this is a substantial state interest, it can be overcome only by evidence that amounts to substantial proof of racial dilution. . . ." *Cousin,* 46 F.3d at 577 (citing *LULAC,* 999 F.2d at 868).

40. The Court concludes, as a matter of law, that Ohio's interest in maintaining the link between its trial and appellate court territorial jurisdictions and those courts' electoral districts is substantial. This linkage "advances the state's substantial interest in judicial effectiveness. Trial judges are elected by a broad range of local citizens, rather than by a narrow constituency. This electoral scheme balances accountability and judicial independence." *LULAC,* 999 F.2d at 868.

41. Moreover, this linkage furthers Ohio's "attempts to maintain the fact and appearance of judicial fairness that are central to the judicial task, in part, by insuring that judges remain accountable to the range of people within their jurisdiction. A broad base diminishes the semblance of bias and favoritism towards the parochial interests of a narrow constituency." *LULAC,* 999 F.2d at 869. See also *Bradley v. Work,* 916 F.Supp. at 1473; *Magnolia Bar Ass'n I,* 793 F.Supp. at 1411; *Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1430–31; *SCLC I,* 785 F.Supp. at 1478

## *"On Account of Race"*

42. To succeed on their claim of vote dilution under § 2 of the Voting Rights Act, Plaintiffs must ultimately prove that the "deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Nipper,* 39 F.3d at 1515. Thus, even if Plaintiffs satisfy their burden under *Gingles:*

[t]he defendant may rebut the plaintiff's evidence by demonstrating the absence of racial bias in the voting community; for example, by showing that the community's voting patterns can best be explained by other, nonracial circumstances. If the defendant offers such proof, the court must be satisfied, before ruling in favor of the plaintiff, that, under the totality of the circumstances, the minority group is denied meaningful access to the political process "on account of race or color." A violation of section 2 may be established under the "results test" without proof of discriminatory intent in the design or maintenance of the challenged scheme. Nonetheless, we hold that section 2 plaintiffs must demonstrate, through the test's objective factors taken as a whole, that a voting community is driven by racial bias and that the challenged electoral scheme allows that bias to dilute the minority population's voting strength.

*Nipper,* 39 F.3d at 1525 (footnotes omitted). See also *LULAC,* 999 F.2d at 850, 853–54; *SCLC II,* 56 F.3d at 1293–94.

43. In this case, numerous factors, other than race, explain losses at the polls by particular minority candidates. As previously noted, Drs. Asher and Tuchfarber, and all of the witnesses who testified herein, identified a number of such factors. Two factors in particular, "partisanship" and "incumbency," accurately explain electoral outcomes in numerous judicial elec-

tions involving African–American candidates. Tr. at 976–77.

44. "Electoral losses that are attributable to partisan politics do not implicate the protections of § 2." *LULAC,* 999 F.2d at 863. See also *Nipper,* 39 F.3d at 1525.

45. "Since it is clear that incumbency frequently plays a determining role in judicial elections, ... the impact of incumbency must be considered in the vote dilution inquiry." *Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1428. See also *SCLC II,* 56 F.3d at 1293 n. 22. See also *Nipper,* 39 F.3d at 1504; *Magnolia Bar Ass'n,* 793 F.Supp. at 1386.

### Availability of a Remedy

46. Even if a plaintiff minority group is otherwise able to establish a violation of § 2 of the Voting Rights Act, judgment must be entered for the Defendants if the Court determines that it lacks the power or authority to impose a remedy upon the state. *Nipper,* 39 F.3d at 1546–47. See also *SCLC II,* 56 F.3d at 1294.

47. If the Court were to find that any of Plaintiffs' claims have any merit with regard to any of the challenged judicial districts, it must first give the Ohio General Assembly the opportunity to propose a remedy of the violation. *Bradley v. Work,* 916 F.Supp. at 1466. See also *Cousin v. McWherter,* 904 F.Supp. 686 (E.D.Tenn. 1995). Cf. *Wise v. Lipscomb,* 437 U.S. 535, 539–40, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978).

48. If the General Assembly thereafter fails timely to propose a remedy, or proposes a remedy that inadequately addresses the violation, this Court's ability to impose a remedy is limited. The Court may "not intrude upon state policy any more than necessary.' Federal courts should follow policies expressed in state statutory and constitutional provisions whenever adherence to state policy would not detract from federal constitutional requirements. *** [Any] remedy to be fashioned in this case must: (1) be district

specific, that is, the remedy may be imposed only in those specific districts where violations have been proven and (2) follow state policies except to the limited extent necessary to remedy the federal violations." *Clark v. Roemer,* 777 F.Supp. at 465–67 (citations omitted). See also *Martin v. Mabus,* 700 F.Supp. 327, 330, 350 (S.D.Miss.1988).

49. In imposing a remedy, the Court lacks the power or authority to fashion a remedy that would alter the structure of the State of Ohio's judicial branch of government. *Nipper,* 39 F.3d at 1531, 1545. See also *Brooks,* 848 F.Supp. at 1564–69.

50. The most significant corollary to this principle is that the Court, when fashioning a remedy, is not permitted to increase the number of judicial positions in any of the challenged courts. *Concerned Citizens for Equality I,* 863 F.Supp. at 403–04 (citing *Holder v. Hall,* 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994)). See also *White,* 74 F.3d at 1072–73; *Concerned Citizens for Equality,* 863 F.Supp. at 397; *Clark v. Roemer,* 777 F.Supp. at 453.

51. The Court cannot require the State of Ohio to abandon her system of electing judges in favor of an appointed judiciary. "[A]n appointment procedure ... is a remedy foreclosed by the Voting Rights Act." *White,* 74 F.3d at 1069–71. See also *Clark v. Roemer,* 777 F.Supp. at 466–67.

52. The Court is also prohibited from altering Ohio's judicial election system by abolishing the "numbered place" system of electing judges and replacing it with a system of "cumulative voting" as advocated by Plaintiffs' witness Marion A. Spencer, the former Vice–Mayor of the City of Cincinnati. Tr. at 586. The State of Ohio:

> should be allowed to have a system for electing judges where they do not compete against each other at election time. There is a problem now of getting the best qualified lawyers to seek judgeships. This problem would be compound-

ed if potential judicial candidates realized that at election time all judges would have as opponents their colleagues on the bench. Such a system would hardly tend to cause harmonious collegiality on the bench, and the heightened probability that one would have the costly task of running for reelection at the conclusion of each term would make seeking judicial office substantially less attractive.

*SCLC I,* 785 F.Supp. at 1477. See also *Nipper,* 39 F.3d at 1546; *Magnolia Bar Ass'n I,* 793 F.Supp. at 1411; *Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1431; *Clark v. Roemer,* 777 F.Supp. at 467–68; *Clark v. Edwards,* 725 F.Supp. at 301. The imposition of a cumulative or proportional representation system of electing judges would result in the "factionalization" of judicial elections. Pl.Ex. 41 at 3; Tr. at 603–05, 1581.

53. A "limited voting" scheme, under which a voter is entitled to cast a number of votes less than the number of positions open, is also an inappropriate remedy because it contravenes Ohio's election laws and "most general concepts of a democratic two-party system." *Martin v. Mabus,* 700 F.Supp. at 337.

54. Finally, the Court concludes that it may not order the creation of a judicial system under which the challenged courts would be divided into electoral subdistricts with a single judge being elected from each subdistrict, but which judge would continue to exercise jurisdiction throughout the territorial jurisdiction of the court. In addition to impermissibly altering the structure of the state judicial system, the imposition of this remedy would result in the destruction of the interests served by the state's linking of electoral and jurisdictional boundaries. *LULAC,* 999 F.2d at 872–73.

55. Subdistricting would actually diminish African–American influence in judicial elections because, although a handful of African–American judges would most likely be elected from a few majority-minority districts, the majority of judges would be elected from districts that were virtually all white. African–Americans would effectively be "disenfranchised" from voting in most judicial elections in the counties at issue herein. Furthermore, minority litigants would not be assured that their cases would be assigned to minority judges elected from their subdistricts. *LULAC,* 999 F.2d at 872–73. See also *Nipper,* 39 F.3d at 1543.

56. Destroying the link between a court's territorial jurisdiction and its electoral district would, contrary to Ohio's policy of de-emphasizing "representation" by judges, impermissibly foster the idea that judges should be responsive to constituents, and would consequently undermine the ideal of an independent-minded judiciary. The imposition of judicial subdistricts would increase the potential for "home cooking" by creating a smaller electorate and thereby placing added pressure on elected judges to favor constituents—especially as election time approaches. *Nipper,* 39 F.3d at 1544. See also *SCLC II,* 56 F.3d at 1297.

57. Subdistricting would destroy the State's interest in preserving judicial accountability by "strip[ping] every voter residing beyond a judge's subdistrict of his or her participation in the judicial selection process—leaving the judge accountable only to those voters in his or her subdistrict." *SCLC II,* 56 F.3d at 1296–97.

58. Subdistricting along racial lines would reinforce racial stereotypes and undermine Ohio's system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole. *SCLC II,* 56 F.3d at 1297. It would further the notion that race matters in the administration of justice, and would, therefore, undermine both the fact and perception of the fairness and impartiality of Ohio's judicial system. *Id.* It is for this reason that any such subdistricting along racial lines, for remedial purposes or oth-

erwise, would be subject to "strict scrutiny" under the Fourteenth Amendment to the United States Constitution pursuant to the Supreme Court's decision in *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), and its progeny. *Milwaukee Branch of the N.A.A.C.P. II,* 935 F.Supp. at 1425. See also *Sanchez v. Colorado,* 97 F.3d 1303, 1328 (10th Cir.1996); *Dillard v. City of Greensboro,* 74 F.3d 230, 233–34 (11th Cir.1996) (citing *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995)).

■■■ 59. Although Plaintiffs have not suggested the subdistricting of *both* the courts' territorial jurisdiction and their electoral districts, which would theoretically preserve Ohio's "linkage" interest, the Court concludes that it lacks the power and authority to impose such a remedy because it would impermissibly alter the structure of Ohio's judicial system. Such a remedy would require a complete revision of Ohio's venue and jury selection rules, which are currently structured on a county-wide basis. The specter of numerous jurisdictional subdistricts would also foster confusion in the administration of justice. *LULAC,* 999 F.2d at 875–76.

### Court of Appeals for Cuyahoga County, Eighth Appellate District

■■■ 60. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Appeals for Cuyahoga County, Eighth Appellate District.

61. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Appeals for Cuyahoga County, Eighth Appellate District, are "politically cohesive."

62. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Court of Appeals for Cuyahoga County, Eighth Appellate District, *i.e,* that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

63. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Court of Appeals for Cuyahoga County, Eighth Appellate District, have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

64. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Appeals for Cuyahoga County, Eighth Appellate District, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Court of Appeals for Cuyahoga County, Eighth Appellate District, in particular.

### Court of Common Pleas for Cuyahoga County

65. The Court concludes Plaintiffs have satisfied their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Common Pleas for Cuyahoga County.

66. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Common Pleas for Cuyahoga County are "politically cohesive."

67. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant

racial bloc voting" in elections for the Court of Common Pleas for Cuyahoga County, *i.e*, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

68. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Court of Common Pleas for Cuyahoga County, have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

69. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Common Pleas for Cuyahoga County, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Court of Common Pleas for Cuyahoga County in particular.

### Bedford Municipal Court

70. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Bedford Municipal Court.

71. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Bedford Municipal Court are "politically cohesive."

72. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Bedford Municipal Court, *i.e*, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates pre-ferred by African–American voters in these elections.

73. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Bedford Municipal Court have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

74. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Bedford Municipal Court, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Bedford Municipal Court in particular.

### Court of Appeals for Franklin County, Tenth Appellate District

75. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Appeals for Franklin County, Tenth Appellate District.

76. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Appeals for Franklin County, Tenth Appellate District, are "politically cohesive."

77. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Court of Appeals for Franklin County, Tenth Appellate District, *i.e*, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

78. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Court of Appeals for Franklin County, Tenth Appellate District, have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

79. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Appeals for Franklin County, Tenth Appellate District, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Court of Appeals for Franklin County, Tenth Appellate District, in particular.

### Court of Common Pleas for Franklin County

80. The Court concludes that Plaintiffs have satisfied their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Common Pleas for Franklin County.

81. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Common Pleas for Franklin County are "politically cohesive."

82. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Court of Common Pleas for Franklin County, i.e, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

83. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Court of Common Pleas for Franklin County have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

84. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Common Pleas for Franklin County, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Court of Common Pleas for Franklin County in particular.

### Franklin County Municipal Court

85. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Franklin County Municipal Court.

86. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Franklin County Municipal Court are "politically cohesive."

87. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Franklin County Municipal Court, i.e, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

88. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters

within the territorial jurisdiction of the Franklin County Municipal Court have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

89. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Franklin County Municipal Court, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Franklin County Municipal Court in particular.

### Court of Appeals for Hamilton County, First Appellate District

90. The Court concludes that Plaintiffs have satisfied their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Appeals for Hamilton County, First Appellate District.

91. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Appeals for Hamilton County, First Appellate District, are "politically cohesive."

92. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Court of Appeals for Hamilton County, First Appellate District, i.e, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

93. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the

Court of Appeals for Hamilton County, First Appellate District, have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

94. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Appeals for Hamilton County, First Appellate District, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Court of Appeals for Hamilton County, First Appellate District, in particular.

### Court of Common Pleas for Hamilton County

95. The Court concludes that Plaintiffs have satisfied their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Common Pleas for Hamilton County.

96. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Common Pleas for Hamilton County are "politically cohesive."

97. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Court of Common Pleas for Hamilton County, i.e, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

98. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Court of Common Pleas for Hamilton

County have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

99. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Common Pleas for Hamilton County, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Court of Common Pleas for Hamilton County in particular.

### Court of Common Pleas for Lucas County

100. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Common Pleas for Lucas County.

101. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Common Pleas for Lucas County are "politically cohesive."

102. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Court of Common Pleas for Lucas County, i.e, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

103. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Court of Common Pleas for Lucas County have less opportunity than other members of the electorate to participate in the politi-

cal process and to elect representatives of their choice.

104. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Common Pleas for Lucas County, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Court of Common Pleas for Lucas County in particular.

### Toledo Municipal Court

105. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Toledo Municipal Court.

106. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Toledo Municipal Court are "politically cohesive."

107. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Toledo Municipal Court, i.e, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

108. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Toledo Municipal Court have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

109. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to

the Toledo Municipal Court, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Toledo Municipal Court in particular.

### Court of Common Pleas for Mahoning County

110. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Common Pleas for Mahoning County.

111. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Common Pleas for Mahoning County are "politically cohesive."

112. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Court of Common Pleas for Mahoning County, i.e, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

113. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Court of Common Pleas for Mahoning County have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

114. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Common Pleas for Mahoning County, the Court concludes that it lacks the power and authority to impose a reme-

dy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Court of Common Pleas for Mahoning County in particular.

### Youngstown Municipal Court

115. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Youngstown Municipal Court.

116. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Youngstown Municipal Court are "politically cohesive."

117. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Youngstown Municipal Court, i.e, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

118. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Youngstown Municipal Court have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

119. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Youngstown Municipal Court, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the

structure of the Youngstown Municipal Court in particular.

### Court of Appeals for Montgomery County, Second Appellate District

120. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Appeals for Montgomery County, Second Appellate District.

121. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Appeals for Montgomery County, Second Appellate District, are "politically cohesive."

122. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Court of Appeals for Montgomery County, Second Appellate District, *i.e*, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

123. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Court of Appeals for Montgomery County, Second Appellate District, have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

124. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Appeals for Montgomery County, Second Appellate District, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies

would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Court of Appeals for Montgomery County, Second Appellate District, in particular.

### Court of Common Pleas for Montgomery County

125. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Common Pleas for Montgomery County.

126. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Common Pleas for Montgomery County are "politically cohesive."

127. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Court of Common Pleas for Montgomery County, *i.e*, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

128. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Court of Common Pleas for Montgomery County have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

129. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Common Pleas for Montgomery County, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter

the structure of Ohio's judicial system in general and the structure of the Court of Common Pleas for Montgomery County in particular.

### Dayton Municipal Court

130. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Dayton Municipal Court.

131. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Dayton Municipal Court are "politically cohesive."

132. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Dayton Municipal Court, *i.e,* that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

133. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Dayton Municipal Court have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

134. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Dayton Municipal Court, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Dayton Municipal Court in particular.

### Montgomery County Court District # 1

135. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Montgomery County Court District # 1.

136. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Montgomery County Court District # 1 are "politically cohesive."

137. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Montgomery County Court District # 1, *i.e,* that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

138. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Montgomery County Court District # 1 have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

139. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Montgomery County Court District # 1, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Montgomery County Court District # 1 in particular.

### Court of Common Pleas for Summit County

140. The Court concludes that Plaintiffs have failed to satisfy their burden of

**586**

proving that African–Americans can constitute a majority in a hypothetical, geographically compact, single-member subdistrict of the Court of Common Pleas for Summit County.

141. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Court of Common Pleas for Summit County are "politically cohesive."

142. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Court of Common Pleas for Summit County, i.e, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

143. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Court of Common Pleas for Summit County have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

144. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Court of Common Pleas for Summit County, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Court of Common Pleas for Summit County in particular.

### *Akron Municipal Court*

145. The Court concludes that Plaintiffs have failed to satisfy their burden of proving that African–Americans can constitute a majority in a hypothetical, geo-graphically compact, single-member subdistrict of the Akron Municipal Court.

146. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that African–American voters within the territorial jurisdiction of the Akron Municipal Court are "politically cohesive."

147. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving the existence of "legally significant racial bloc voting" in elections for the Akron Municipal Court, i.e, that white voters vote sufficiently as a bloc to usually or consistently defeat the candidates preferred by African–American voters in these elections.

148. The Court concludes that the Plaintiffs have failed to satisfy their burden of proving that, under the totality of the circumstances, African–American voters within the territorial jurisdiction of the Akron Municipal Court have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

149. Even if Plaintiffs had satisfied their burden of proving a violation of § 2 of the Voting Rights Act with respect to the Akron Municipal Court, the Court concludes that it lacks the power and authority to impose a remedy for such violation because all potential remedies would impermissibly alter the structure of Ohio's judicial system in general and the structure of the Akron Municipal Court in particular.

### III. DISPOSITION

Plaintiffs have failed to establish a violation of § 2 of the Voting Rights Act for any of the challenged courts, and Defendants are, therefore, entitled to judgment in their favor on all counts of Plaintiffs' Complaint.

The Clerk shall enter a final judgment in favor of defendants, against plaintiffs, dismissing this action with prejudice.

The Clerk shall remove this case from the Court's pending cases and motions lists.

**IT IS SO ORDERED.**